*Appeal Nos. 14-1435, 14-1531, 15-1186*

═══════════════════════════════════════

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
────────────────────────────────────

LENDINGTREE, LLC,

*Plaintiff - Appellant,*

v.

ZILLOW, INC.,

*Defendant - Cross-Appellant.*

NEXTAG, INC., ADCHEMY, INC.,

*Defendants.*

────────────────────────────────────
Appeals from the United States District Court for the Western
District of North Carolina in case no. 3:10-cv-00439-FDW-DCK
Chief Judge Frank D. Whitney
═══════════════════════════════════════

**PRINCIPAL AND RESPONSE BRIEF OF
DEFENDANT-CROSS APPELLANT ZILLOW, INC.**
────────────────────────────────────

J. David Hadden (CSB No. 176148)
dhadden@fenwick.com
Saina S. Shamilov (CSB No. 215636)
sshamilov@fenwick.com
Todd R. Gregorian (CSB No. 236096)
tgregorian@fenwick.com
Ravi Ranganath (CSB No. 272981)
rranganath@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone:  650.988.8500
Facsimile:   650.938.5200

*Attorneys for Defendant-Cross-Appellant
Zillow, Inc.*

November 25, 2015

## CERTIFICATE OF INTEREST

Counsel for Defendant and Cross-Appellant, Zillow, Inc., certifies the following:

1.  The full name of every party represented is:  Zillow, Inc.

2.  The name of the real party in interest represented is:  Zillow, Inc.

3.  Zillow, Inc. has no parent corporations and no publicly held companies own 10 percent or more of its stock.

4.  The name of the firm and the partners or associates that appeared for the represented party in the trial court, or are expected to appear in this Court, are:

    FENWICK & WEST LLP:  J. David Hadden, Lynn Pasahow, Carolyn Chang, Saina S. Shamilov, Todd R. Gregorian, Ravi Ranganath, Yevgeniya A. Titova, Ryan A. Tyz, Elizabeth J. White;

    HUNTON & WILLIAMS LLP: Frank E. Emory;

    WOMBLE, CARLYLE, SANDRIDGE & RICE, LLP:  Mark P. Henriques, Sarah M. Stone.

Dated:  November 25, 2015                    Respectfully submitted,

                                             */s/ J. David Hadden*
                                             J. David Hadden

                                             *Attorneys for Defendant-Cross-Appellant Zillow, Inc.*

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................2

INTRODUCTION .................................................................................4

STATEMENT OF THE CASE.................................................................6

STATEMENT OF FACTS ......................................................................7

I.      THE ASSERTED PATENTS..........................................................7

II.     THE DISTRICT COURT'S CLAIM CONSTRUCTIONS ..........12

III.    ZILLOW'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY ............................................................................14

IV.    ZILLOW AND THE ACCUSED ZILLOW MORTGAGE MARKETPLACE SERVICE ......................................................16

V.     TRIAL AND THE JURY VERDICT OF NON-INFRINGEMENT AND INVALIDITY ..................................................................18

        A.    Zillow's Evidence of Non-Infringement ............................18

        B.    LendingTree's Infringement Case and Disregard of the District Court's Claim Constructions..................................21

        C.    Invalidity Due to Improper Inventorship ...........................23

        D.    The Jury's Non-Infringement and Invalidity Verdict and LendingTree's Attempt to Correct Inventorship.................24

SUMMARY OF THE ARGUMENT ....................................................25

# TABLE OF CONTENTS
## (Continued)

Page

ARGUMENT ...........................................................................................27

I.     THE COURT SHOULD AFFIRM THE JURY VERDICT OF
NON-INFRINGEMENT. ...............................................................27

     A.     The District Court Properly Construed "Credit Data." ......................28

     B.     The District Court Properly Construed "Offer" and "Positive
Credit Decision." ................................................................39

     C.     The District Court Properly Construed the "Whereby"
Clauses................................................................................42

     D.     LendingTree Suffered No Prejudice as a Result of the
District Court's Claim Constructions.................................44

II.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
IN ITS EVIDENTIARY RULINGS. ...........................................46

     A.     The District Court Properly Prevented LendingTree from
Eliciting Testimony Regarding Claim Construction..........................47

     B.     The District Court Properly Admitted Evidence of
LendingTree's Prior Testimony and Inconsistent Litigation
Positions. ...........................................................................52

III.     THE DISTRICT COURT CORRECTLY DECLINED TO ORDER
CORRECTION OF THE PATENTS-IN-SUIT. ...........................................56

     A.     The District Court Had Discretion Over Whether to Order
Correction of the Patent.....................................................56

     B.     The District Court Correctly Determined It Could Not
Correct The Patents Based on The Record at Trial.............................59

# TABLE OF CONTENTS
## (Continued)

**Page**

IV.   LENDINGTREE'S PATENTS CLAIM INELIGIBLE SUBJECT
      MATTER UNDER 35 U.S.C. § 101. .............................................................66

    A.   The LendingTree Patents Embody an Abstract Idea. .........................68

    B.   The LendingTree Patents Merely Computerize the Idea of a
         Credit Application Clearinghouse. ......................................................71

    C.   LendingTree Conceded its Patents Track the Claims of the
         *Ultramercial* Patent. ..........................................................................75

CONCLUSION .....................................................................................................76

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*3M Innovative Props. Co. v. Tredegar Corp.*,
 725 F.3d 1315 (Fed. Cir. 2013) ........................................................41

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
 134 S. Ct. 2347 (2014) ..............................................................*passim*

*Andersen Corp. v. Fiber Composites*,
 474 F.3d 1361 (Fed. Cir. 2011) ........................................................41

*Anderson v. Yungkau*,
 329 U.S. 482 (1947) ..........................................................................58

*Akamai Techs. v. Cable & Wireless Internet Servs.*,
 344 F.3d 1186 (Fed. Cir. 2003) ........................................................62

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
 133 S. Ct. 2107 (2013) ......................................................................66

*Baran v. Med. Device Techs., Inc.*,
 616 F.3d 1309 (Fed. Cir. 2010) ........................................................41

*Barton v. Adang*,
 162 F.3d 1140 (Fed. Cir. 1989) ........................................................57

*Beacon Theatres, Inc. v. Westover*,
 359 U.S. 500 (1959) ..........................................................................64

*Bilski v. Kappos*,
 561 U.S. 593 (2010) ....................................................................66, 74

*Biovail Corp. Int'l. v. Andrx Pharms., Inc.*,
 239 F.3d 1297 (Fed. Cir. 2001) ........................................................32

*buySAFE, Inc. v. Google, Inc.*,
 765 F.3d 1350 (Fed. Cir. 2014) ....................................67, 69, 70, 72

*Cabinet Vision v. Cabnetware*,
 129 F.3d 595 (Fed. Cir. 1997) ..........................................................64

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Canton Bio-Med, Inc. v. Integrated Liner Techs., Inc.*,
   216 F.3d 1367 (Fed. Cir. 2000) ..........................................................38

*Cimcore Corp. v. Faro Techs., Inc.*,
   No. 03 CV 2355-B(WMC), 2007 U.S. Dist. LEXIS 17936 (S.D.
   Cal. Mar. 12, 2007) ...........................................................................50

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
   776 F.3d 1343 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119 (2015) ....67, 69, 73

*Cordis Corp. v. Boston Scientific Corp.*,
   561 F.3d 1319 (Fed. Cir. 2009) ..........................................................47

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ....................................................67, 70

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
   424 F.3d 1168 (Fed. Cir. 2005) ..........................................................48

*Datamize, LLC v. Plumtree Software, Inc*.,
   417 F.3d 1342 (Fed. Cir. 2005) ..........................................................44

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) ..........................................................75

*Dealertrack, Inc. v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012) .......................................67, 69, 70, 73

*Eli Lilly & Co. v. Bd. of Regents of the Univ. of Wash.*,
   334 F.3d 1264 (Fed. Cir. 2003) ..........................................................57

*Elkay Mfg. Co. v. EBCO Mfg. Co.*,
   192 F.3d 973 (Fed. Cir. 1999) ............................................................32

*Ericsson, Inc. v. D-Link Sys*.,
   773 F.3d 1201 (Fed. Cir. 2014) ..........................................................54

*Ethicon, Inc. v. U.S. Surgical Corp*.,
   135 F.3d 1456 (Fed. Cir. 1998) ..........................................................61

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) ......................................................................... 60

*Fina Oil & Chem. Co. v. Ewen*,
123 F.3d 1466 (Fed. Cir. 1997) ........................................................ 61

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,
389 F.3d 1370 (Fed. Cir. 2004) ........................................................ 37

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
349 F.3d 1373 (Fed. Cir. 2003) ........................................................ 37

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) ........................................................ 38

*Hess v. Advanced Cardiovascular Sys., Inc.*,
106 F.3d 976 (Fed. Cir 1997) .................................................... 61, 63

*Hitzeman v. Rutter*,
243 F.3d 1345 (Fed. Cir. 2001) ........................................................ 42

*In re Lewis*,
845 F.2d 624 (6th Cir. 1988) ............................................................ 64

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (2015) ................................................................. 68, 73

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) ........................................................ 73

*Johns Hopkins University v. CellPro, Inc.*,
152 F.3d 1342 (Fed. Cir. 1998) ........................................................ 45

*Kingdomware Techs. Inc. v. United States*,
754 F.3d 923 (Fed. Cir. 2014), *cert. granted*, 135 S.Ct. 2857
(2015) ............................................................................................... 57

*Kolmes v. World Fibers Corp.*,
107 F.3d 1534 (Fed. Cir. 1997) .................................................. 46, 50

vii

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Kumar v. Ovonic Battery Co.*,
351 F.3d 1364 (Fed. Cir. 2003) ........................................................32

*Linear Tech. Corp. v. Micrel, Inc.*,
No. C-94-1633 MHP, 2006 U.S. Dist. LEXIS 96860 (N.D. Cal.
Jun. 9, 2006)......................................................................................50

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
672 F.3d 1350 (Fed. Cir. 2012) (en banc) ........................................50

*Mayo Collaborative Servs. v. Prometheus Labs.*,
132 S. Ct. 1289 (2012).................................................................71, 72

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007) ........................................................30

*Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am.*,
16 F.3d 410, 1994 WL 34745 (4th Cir. 1994) ..................................64

*Medrad, Inc. v. MRI Devices Corp.*,
401 F.3d 1313 (Fed. Cir.2005) .........................................................44

*Millner v. Schweiker*,
725 F.2d 243 (4th Cir. 1984) ............................................................63

*MySpace, Inc. v. GraphOn Corp.*,
672 F.3d 1250 (Fed. Cir. 2012) ........................................................27

*Novo Indus., L.P. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003) ........................................................57

*Novo Nordisk A/S v. Becton Dickinson & Co.*,
304 F.3d 1216 (Fed. Cir. 2012) ........................................................54

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ...................................................47, 50

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015), *petition for cert. filed* (U.S. Nov.
12, 2015) ................................................................................67, 69, 73

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Organic Seed Grower & Trade Ass'n v. Monsanto Co.*,
  718 F.3d 1350 (Fed. Cir. 2013), *cert. denied*, 134 S. Ct. 901 (2014) ...............75

*P.R. Chunk, Inc. v. Martin Marietta Materials, Inc.*,
  170 F. App'x 288 (4th Cir. 2006) ......................................................................60

*Pannu v. Iolab Corp.*,
  155 F.3d 1344 (Fed. Cir. 1998) ....................................................................58, 59

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .......................................................29, 32, 40, 43

*Planet Bingo, LLC v. VKGS LLC*,
  576 F. App'x 1005 (Fed. Cir. 2014) ..................................................................70

*Pressure Prods. Med. Supplies v. Greatbatch Ltd.*,
  599 F.3d 1308 (Fed. Cir. 2010) ........................................................................45

*Research Plastics v. Fed. Packaging Corp.*,
  421 F.3d 1290 (Fed. Cir. 2005) ........................................................................42

*Retractable Tech. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) ........................................................................41

*Shum v. Intel Corp.*,
  499 F.3d 1272 (Fed. Cir. 2007) ........................................................................64

*Stomper v. Amalgamated Transit Union, Local 241*,
  27 F.3d 316 (7th Cir. 1994) ..............................................................................59

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015).........................................................................................42

*Tex. Instruments, Inc. v. U. S. Int'l Trade Comm'n*,
  805 F.2d 1558 (Fed. Cir. 1986) ........................................................................50

*Ultramercial, Inc. v. Hulu, LLC*,
  722 F.3d 1335 (Fed. Cir. 2013) (*Ultramercial I*) ...............................................14

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) (*Ultramercial II*), *cert. denied*, 135
    S. Ct. 2907 (2015) ..........................................................................*passim*

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005) ........................................................38

*Verizon Servs. Corp. v. Cox Fibernet Va.*, *Inc.*,
    602 F.3d 1325 (Fed. Cir. 2010) ........................................................38

*Versata Software, Inc. v. SAP Am., Inc.*
    717 F.3d 1255 (Fed. Cir. 2013) ........................................................63

*z4 Techs., Inc. v. Microsoft Corp.*,
    507 F.3d 1340 (Fed. Cir. 2007) ..................................................39, 62

STATUTES AND RULES

28 U.S.C. § 1295(a)(1) ..........................................................................1

35 U.S.C. § 101 ...........................................................................*passim*

35 U.S.C. § 102(f) ..........................................................................6, 63

35 U.S.C. Section 256 ...................................................................*passim*

Fed. R. App. P. 4(a)(1)(A) & (a)(4) ......................................................1

Fed. R. Civ. Proc. 50(a)(2) ..................................................................60

Fed. R. Evid. 103(a) .............................................................................54

Fed. R. Evid. 801(d)(1) & (d)(2) .........................................................53

OTHER AUTHORITIES

37 C.F.R. 1.324(a) ...............................................................................57

**STATEMENT OF RELATED CASES**

No other appeal in or from the same civil action or proceeding in the lower court was previously before this or any other appellate court. Zillow, Inc. ("Zillow") knows of no pending case that will directly affect or be directly affected by the Court's decision in this appeal.

**JURISDICTIONAL STATEMENT**

Zillow agrees with the jurisdictional statement of LendingTree, LLC ("LendingTree") with respect to its issues on appeal.

The Court has jurisdiction of Zillow's cross-appeal pursuant to 28 U.S.C. § 1295(a)(1). The district court entered an order denying Zillow's motion for summary judgment of invalidity under 35 U.S.C. § 101 on March 31, 2014. It entered the amended final judgment incorporating this ruling on April 29, 2014. Zillow filed a timely notice of appeal on May 29, 2014. *See* Fed. R. App. P. 4(a)(1)(A) & (a)(4).

## STATEMENT OF THE ISSUES

*In LendingTree's appeal*:

1.    Whether the district court erred in its claim constructions for the terms "credit data," "offers," "positive credit decisions," or the "whereby" clauses, and whether substantial evidence nonetheless supported the jury's verdict of no infringement.

2.    Whether the district court abused its discretion in its evidentiary rulings at trial that:

    a.    LendingTree could not examine Zillow's expert on mortgage loan origination regarding whether the description of the preferred embodiment in the specification contradicts the district court's claim construction;

    b.    Zillow could examine LendingTree witnesses regarding LendingTree's prior statements about mortgage loan origination and its own system, when such statements contradicted LendingTree's infringement position and were already admitted in evidence without objection.

3.    Whether the district court erred by declining to order correction of the patents-in-suit to name different inventors when the trial record disclosed multiple potential errors supporting the jury's invalidity verdict.

*In Zillow's cross-appeal*:

1.    Whether the district court erred in denying Zillow's motion for summary judgment of invalidity under 35 U.S.C. § 101.

## INTRODUCTION

The patents-in-suit describe a business model whereby borrowers apply for credit from multiple lenders over the Internet by completing one loan application. The patents describe the invention as a ten-stage process beginning with presenting the borrower with a credit application, to sending the completed application to lenders based on their selection criteria, and ending with notification of loan closure from the lender. The invention performs the function of a mortgage broker or similar intermediary; the patents' principal advance is to perform that function on networked computers over the Internet.

The market never embraced the patented approach. Instead, most consumers use services such as Zillow's that employ a process that ends before they apply for credit. Under this approach, the service accepts borrower inquiries for loan and rate information, identifies lenders offering loans based on the user's specifications, and then matches borrowers with lenders for purposes of negotiating loan terms. Borrowers receive rate information without having to input sensitive personal information or provide their contact information to lenders. Any later credit application or loan transaction takes place outside the system.

Throughout the case, LendingTree attempted to redraft its claims to cover systems such as Zillow's that do not, for example, require a borrower to complete a credit application or result in a lender making a loan offer. LendingTree's princi-

pal argument rests on a misreading of the specification. It contends that in the preferred embodiment, a lender receives data necessary to offer credit only after it has made an "offer" to users of the system. Accordingly, the argument goes that "offer" cannot be a "real offer" and instead must be a mere indication of interest. The specification makes clear throughout, however, that the credit application provides the lender with such data before any decision to offer credit. The district court rejected LendingTree's argument in its claim constructions, and resisted LendingTree's attempt to reargue claim construction at trial. Ultimately, the jury did not credit LendingTree's infringement positions, and also found the patents invalid for failure to name the correct inventors.

Abstract ideas are not patent-eligible. A patentee cannot claim concepts such as budgeting, processing information through a clearinghouse, collecting and storing data, or underwriting transactions on the Internet. LendingTree's patents do precisely this: they claim the abstract idea of a loan application clearinghouse applied over generic computers and the Internet. They do not differ meaningfully from patents recently invalidated by the Court, as LendingTree itself admitted, in its opposition to Zillow's summary judgment motion, by charting its claims to show their similarity to the patent invalidated in *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) (*Ultramercial II*), *cert. denied*, 135 S. Ct. 2907 (2015). LendingTree's patents are invalid under 35 U.S.C. Section 101.

## STATEMENT OF THE CASE

LendingTree filed suit against Zillow and four other defendants on September 8, 2010, alleging infringement of U.S. Patent Nos. 6,385,594 and 6,611,816. A1000-09.  Zillow answered the complaint on October 28, 2010, asserting defenses including invalidity under 35 U.S.C. §§ 101 and 102(f).  A1104; A1139.  The district court issued orders construing the claims on April 12, 2012 and October 4, 2012.  A1-2; A6-13.

Following the first claim construction order, on May 4, 2012, Zillow moved for summary judgment under 35 U.S.C. § 101.  A584.  The district court did not resolve this motion on the merits, and Zillow renewed its motion after the district court completed claim construction, on September 6, 2013.  A602.  The district court held a hearing on the renewed motion and took it under submission.  A617.

The district court conducted a jury trial during February 10, 2014 to March 12, 2014.  On March 12, 2014, the jury returned a unanimous verdict of non-infringement for each asserted claim.  A7248-249.  It also found both asserted patents invalid because they failed to identify the correct inventors under 35 U.S.C. § 102(f).  A7250.  Later that same day, the district court orally denied Zillow's motion for summary judgment of invalidity under 35 U.S.C. § 101.  A11346 at 4376:2-12.

On March 31, 2014, the district court entered judgment based on the jury's verdict.  A18.  On April 29, 2014, the district court issued an amended judgment incorporating its ruling on the summary judgment motion.  A22.  Zillow filed a timely notice of appeal on May 29, 2014.  A23.

## STATEMENT OF FACTS

## I.    THE ASSERTED PATENTS

LendingTree asserted two patents against Zillow in this case:  U.S. Patent Nos. 6,385,594 and 6,611,816, each entitled "Method and Computer Network for Co-ordinating a Loan Over the Internet."  The '816 patent claims priority to the '594 patent, which was filed on May 8, 1998.  A500, A518.  Both name Douglas Lebda and Richard Stiegler as inventors.  *Id.*

According to the patentee, before the invention borrowers could not apply for credit from multiple lenders without separately approaching each one to fill out an application.  A530 at 1:43-45.  Their purported innovation is a universal credit application that a borrower need only fill out once to receive competing offers from lenders via the Internet.  *Id.* at 1:61-65.  The invention thus aims to provide a fast and convenient process to apply for credit.  *Id.* at 1:56-58.

The patents disclose a method that allows a user to apply to multiple lending institutions simultaneously.  *Id.* at 1:50-52.  A user submits a single credit applica-

tion[1] to a plurality of lending institutions. *Id.* at 1:54-65. The lenders provide

screening criteria that the system uses to filter the applications. *Id.* at 2:9-17. An

application that meets a lender's criteria is transmitted to that lender. *Id.* Each

lender can respond to the pre-screened application by making an offer of credit

through, for example, a website or an e-mail message. *Id.* at 2:18-21. The user

chooses from among the competing offers, and the system stores data about the

credit transaction once it is closed. A530 at 3:21-25.

   Figure 1 of each asserted patent describes the ten stages of the claimed

method:

---

[1] The patents refer to credit applications as electronic "qualification forms." The prosecution history clarifies that these terms are equivalent. A2264-265 ("By this Preliminary Amendment, the Specification has been amended to add the term "qualification form" when referring to a credit application.").



FIG. 1

As set forth in the detailed description, the key steps in the process include:

- **A prospective borrower fills out a credit application**. A533 at Cl. 1; A520 at Fig. 1; A530-531 at 2:9-14, 2:16, 3:14-17; A514 at Cl. 1.

- **The system reviews the credit application to ensure the borrower has provided all information in proper form.** In the preferred embodiment, this information includes the borrower's Social Security number. A522 at Figs. 3A-B; A530-531 at 3:19-21, 4:18-30.

- **The credit application is compared to criteria provided by lenders for extending credit.** A525 at Fig. 8; A530-531 at 2:5-6, 2:16-17, 3:25-27.

- **The credit application is sent to matching lenders, who accept or deny the loan application.** A530-531 at 2:21-23, 3:27-29.

- **Lenders that accept the application respond by making offers of credit or a loan to the user over the Internet.** A530 at 1:63-65, 2:15-25; A514 at Cl. 1.

- **The user responds by accepting the offer, denying it, or requesting more information.** A531 at 3:31-32; A514 at Cl. 1.

- **If the user accepts, the lender contacts him or her to complete the transaction and close the loan.** A529 at Fig. 12; A533 at 7:3-15. In one embodiment, the acceptance email contains a name, Social Security number, application number, and contact information, which the lending institution may use to close the loan. *Id.*

- **Information on the closed loan transaction is stored in a database.** A533 at 7:13-17.

Thus, the claimed method begins with a borrower completing a credit application and ends with notification of a closed loan, *i.e.* a completed credit transaction.

LendingTree asserted claims 1 and 6 of the '594 patent and claims 1, 4, 5, 18, 19, 20, 22, 23 and 24 of the '816 patent against Zillow.  Of these, only claim 1 of the '594 patent and claims 1, 18, and 22 of the '816 are independent claims. Claim 1 of the '594 patent, reproduced below, is representative:

> 1. A method for coordinating an electronic credit qualification form between an Internet user and a plurality of lending institutions via the Internet, comprising the steps of:
>
> > a) receiving selection criteria from the plurality of lending institutions;
> >
> > b) storing the selection criteria in a database;
> >
> > c) displaying a plurality of documents in a web site;
> >
> > d) receiving a plurality of credit data sent from the Internet user;
> >
> > e) applying said credit data to a filter comprising the plurality of selection criteria of the database to select without manual intervention each one of said plurality of lending institutions associated with a match of said credit data to said selection criteria;
> >
> > f) determining an appropriate transfer method to transmit said electronic credit qualification form to the lending institutions associated with a match of said credit data;
> >
> > g) transmitting said electronic qualification form comprising said credit data to said plurality of lending institutions associated with a match of said credit data via said appropriate transfer method, the transmission of said electronic qualification form comprising said

11

credit data occurring without a delay for reception of any credit decisions from said lending institutions;

h) receiving a plurality of positive credit decisions from said plurality of lending institutions associated with a match of said credit data regarding an offer of credit or a loan to the Internet user;

i) simultaneously displaying the plurality of positive credit decisions to the Internet user on the web site;

j) receiving via the web site at least one decision from the Internet user regarding at least one of the positive credit decisions, the Internet user's decision comprising an acceptance, denial or request for more information regarding a positive decision for one of said lending institutions associated with a match of said credit data; and

k) transmitting the at least one Internet user's decision to at least one lending institution corresponding with a positive credit decision so that said Internet user can obtain credit or a loan from one of said lending institutions associated with a match of said credit data, whereby said lending institutions associated with a match of said credit data compete with each other for business with the Internet user.

## II.    THE DISTRICT COURT'S CLAIM CONSTRUCTIONS

The asserted claims all require receipt of "credit data" from a user, filtering or applying selection criteria to that data, and transmitting an application comprising such data to lenders. *See, e.g.*, A514 at Cl. 1. LendingTree proposed the court construe this term as "data reflecting the potential creditworthiness of the user." A1236. This implied that "credit data" could refer to even a minimal amount of information about a user's creditworthiness, even though the patents require that a lender make an actual loan offer based on the credit data received. Indeed, LendingTree's own expert admitted that to assess creditworthiness of a user, a lender

12

would require not just a single piece of information, but a name, Social Security number, and address to obtain a credit report and FICO score, as well as information on income, employment, and assets. A12893-896 at 141:3-145:12. The district court instead construed the term as: "information entered on the qualification form sufficient for a lending institution to make a decision to extend or deny credit." A2.

Certain asserted claims require that a lending institution respond to a completed application with "offers" or "positive credit decisions." *See* A514 at Cl. 1; A534 at Cls. 19, 20, and 24. LendingTree's expert testified that a "credit decision" was a decision that a financial institution would make in determining whether or not to offer a loan (A12898 at 188:5-10), rather than a decision to move forward or potential loan terms. LendingTree nonetheless proposed that "positive credit decision" did not require construction, or alternatively that both terms be construed as "loan terms for which the user may qualify." A1238, A1240. The district court construed the terms to require an actual offer of credit, "a proposal to extend credit that can be accepted by the user to create mutual assent." A2.

Certain asserted claims recite "whereby" clauses requiring that the lenders compete in the claimed method. *See* A514 at Cl. 1; A533-534 at Cls. 1 and 22. LendingTree contended these clauses did not limit the scope of the claims because they showed an intended result. The district court disagreed, finding that

13

they add substantive limitations not recited elsewhere in the claims.  A11-12.  The district court construed the clauses to require lenders to compete for the user's business:  "the selected lending institutions simultaneously compete by providing offers for credit to the computer user via the [computer network / Internet]."  *Id.*

## III.  ZILLOW'S MOTION FOR SUMMARY JUDGMENT OF INVALIDI-TY

Zillow moved for summary judgment of invalidity on the basis that the patents claim the abstract concept of processing a credit application through a clearinghouse, unpatentable subject matter under 35 U.S.C. § 101.  A2007, A2012.  The district court decided to rule on patent eligibility after claim construction, and struck the motion as premature.  A2221.  Zillow renewed its motion after the completion of claim construction.  A2654.

LendingTree's opposition to the motion argued that the asserted patents paralleled the claims found patent-eligible in *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013) (*Ultramercial I*).  A3209-214.  It charted the elements of claim 1 of the '594 patent against the patent in *Ultramercial I*:

| LendingTree's '594 Patent, Claim 1 | *Ultramercial* Claim[60] |
|---|---|
| A method for coordinating an electronic credit qualification form between an Internet user and a plurality of lending institutions via the Internet, comprising the steps of: | A method for distribution of products over the Internet via a facilitator, said method comprising the steps of: |
| a) receiving selection criteria from the plurality of lending institutions; | a first step of receiving, from a content provider, media products that are covered by intellectual-property rights protection and are available for purchase, wherein each said media product being comprised of at least one of text data, music data, and video data; |
| b) storing the selection criteria in a database; | a second step of selecting a sponsor message to be associated with the media product, said sponsor message being selected from a plurality of sponsor messages, said second step including accessing an activity log to verify that the total number of times which the sponsor message has been previously presented is less than the number of transaction cycles contracted by the sponsor of the sponsor message; |
| c) displaying a plurality of documents in a web site; | a third step of providing the media product for sale at an Internet website; |
| d) receiving a plurality of credit data sent from the Internet user; | a fourth step of restricting general public access to said media product; |
| e) applying said credit data to a filter comprising the plurality of selection criteria of the database to select without manual intervention each one of said plurality of lending institutions associated with a match of said credit data to said selection criteria; | a fifth step of offering to a consumer access to the media product without charge to the consumer on the precondition that the consumer views the sponsor message; |
| f) determining an appropriate transfer method to transmit said electronic credit qualification form to the lending institutions associated with a match of said credit data; | a sixth step of receiving from the consumer a request to view the sponsor message, wherein the consumer submits said request in response to being offered access to the media product; |

A3210-211. It argued: "Each claim involves an 11-step method of providing a product or service over the Internet that is . . . otherwise available outside the Internet—*i.e.,* competition among lending institutions (LendingTree) and online-streaming media (Ultramercial)." A3212. Further, each claim "requires intricate and complex computer programming" and "provides a result that is greater than the sum of its parts." *Id.* LendingTree concluded: "Due to the strong similarities

15

in the nature and number of steps in the patented processes, the similar level of detail set forth in the claims, and the inherent complexity of employing computers on the Internet…" the district court should treat them similarly.[2]  A3214.

The court took the motion under submission following a hearing.  A617.  On the first day of trial, it indicated it would rule on the motion as a matter of law.  *Id.* at 84:12-13.  After the jury returned its verdict, the district court issued an oral ruling denying the motion.  A11346 at 4376:2-12.  The district court later issued a written order that memorialized its holding but did not state its reasoning.  A16.

## IV.  ZILLOW AND THE ACCUSED ZILLOW MORTGAGE MARKET-PLACE SERVICE

Zillow provides a real estate website that gives consumers tools to make smart decisions about their homes.  A10591 at 1649:8-10.  One such tool, the accused Zillow Mortgage Marketplace service, allows users to quickly browse mortgage rates without providing personal identifying information.  *Id.* at 1649:13-1650:14, 1650:24-1651:7; A10592 at 1653:18-1654:13.

A user opening the website sees a screen like the following:

---

[2] Subsequently, this Court found the *Ultramercial* patent ineligible in view of the Supreme Court's opinion in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).  *Ultramercial II*, 772 F.3d at 711-713.



A13204 (admitted by stipulation; *see* A10298-299 at 509:23-510:2).

The right side of the screen shows a rate table, including a list of lenders and their "default" rate information (*i.e.* average rates not customized for the user). A10591-593; A10609-610 at 1724:24-1725:12. The left side shows a form that allows the user to obtain more accurate rate quotes by entering a zip code, purchase price, down payment, and credit score. A10591-593 at 1652:7-1653:4. The "Advanced" option opens a more detailed form that provides still more accurate quotes, once filled out with additional information such as borrower income. A10592 at 1653:5-12.

To prevent unsolicited contact from lenders, the website does not allow users to input personal information, such as a name or social security number. *Id.* at 1653:18-1654:13. When a user clicks on "Get Rates," the system returns a list of non-binding rate quotes. A10592-593 at 1654:15-1656:1, 1657:14-15. Lending institutions do not provide these quotes. *Id.* at 1656:5-1657:2. Instead, they come from a "rate engine," a database that uses saved searches and market index rates to estimate the current rate a lender would charge the user. A10592 at 1654:15-1656:16.

If they so desire, users can then select one or more lenders and provide their contact information. A10593 at 1659:23-1660:14. Zillow then provides a lead to the selected lenders who may contact the potential borrower outside of the system. A10593 at 1659:23-1660:14; A10601 at 1691:17-20; A12715; A10827 at 2567:20-21. Any further interaction between the user and the lender happens outside of the system and without Zillow's participation. *Id.*

## V.    TRIAL AND THE JURY VERDICT OF NON-INFRINGEMENT AND INVALIDITY

### A.    Zillow's Evidence of Non-Infringement

The evidence at trial showed that Zillow's system did not practice the patented invention:

- The Zillow system does not collect sufficient information for a lender to make a decision to extend or deny credit (*e.g.* A10760-765);

- The Zillow system does not transmit credit data to lending institutions (*e.g.* A10592 at 1654:19-1656:1; A10988 at 3201:11-3203:7);

- The Zillow system does not allow lending institutions to make offers of credit that can be accepted to create mutual assent or a binding promise (*e.g.* A10593 at 1657:17-1658:1; A10764-765 at 2320:16-2323:22).

In contrast with the minimal and anonymous information provided through the Zillow system, to make a decision to extend or deny credit, mortgage lenders require the full set of information in a Form 1003 Uniform Residential Loan Application.  A10760 at 2303:22-2305:9.  The URLA Form 1003 includes the borrower's name, Social Security number, and date of birth—information required in order to obtain a credit report and FICO score.  *Id.* at 2305:14-2306-12.  It also includes the borrower's income, current address, assets, liabilities, and the address of the property that will provide collateral for the loan.  A10761 at 2309:7-231-:15.  This gives the lender sufficient information to, among other things, verify the borrower's employment, run a credit report, and to order the appraisal of the subject property.  A10763 at 2316:3-20.  The evidence at trial showed that Zillow's system does not collect the user's name, Social Security number, date of birth, the subject

property address, or information about the user's assets and liabilities.  A10763 at 2317:5-2318:1; A10947 at 3038:4-11, 3040:23-25.  Zillow therefore did not collect "credit data" as construed by the district court.

The evidence additionally showed that Zillow's system sends the user information it does collect to a "rate engine"—a computer database—rather than a lending institution.  A10592-593 at 1654:14-1657:2.  The rate quotes the system provides come from this rate engine.  *Id*.  Thus, Zillow did not transmit credit data to selected lending institutions as required by the asserted claims.

The evidence also showed that the Zillow system provides non-binding rate quotes based on limited financial information.   A10593 at 1657:17-1658:1; 1658:20-1659:2.  Accordingly, the Zillow system did not make a proposal to extend credit that could be accepted to create mutual assent or a binding promise, as required under the district court's constructions of "offers" and "positive credit decisions."  A10593 at 1657:11-1658:1, 1659:6-10, A10764-765 at 2320:16-2323:22.  As Zillow does not receive "credit data," does not transmit "credit data" to lending institutions, and does not allow lenders to provide "offers" or "credit decisions" to users, Zillow could not infringe any asserted claim under the district court's constructions.

**B.    LendingTree's Infringement Case and Disregard of the District Court's Claim Constructions**

LendingTree argued at trial that the asserted patents described a system for providing sales leads rather than coordinating loans.  A10234 at 261:12-23.  It characterized the asserted patents as reading on the current LendingTree website, which provides sales leads but not loan offers.  A10033 at 134:22-23; A10350-351 at 709:13-713:20**.**  These positions forced LendingTree to contest the court's claim constructions in its trial presentation:

- LendingTree argued that credit data could include as many as 200 different types of data, and that a subset of this information (*i.e.* a borrower's self-reported income) could be sufficient information for a lender to extend or deny credit.  A10783 at 2395:21-2398:19.

- LendingTree contended that a lender could make a binding offer without a user's Social Security number.  A10784 at 2399:5-9; A10789 at 2419:17-20. But to do so, it argued that a rate quote would be "binding" on the lender so long as the parties had a *belief* that a loan would *eventually* close.  A10798 at 2456:12-19; A10800-801.

- LendingTree contended that an agreement to move forward in the loan process could be considered an "offer," and that the offer made in the preferred embodiment was such an offer.  A10030 at 124:9-19; A10153 at 53:19-22, 55:6-56:13.  Ignoring disclosures in the patent that show the entry of a user's

social security number in the credit application, it argued the lender did not receive the user's Social Security number until it had already made an offer. A512 at 3:8-10; 4:8-11; A503 at Fig. 3B; A10720 at 2149:10-2151:13.

LendingTree's attempts to circumvent the district court's claim constructions prompted the district court to reprimand it. A10770 at 2343:9-19; A10830 at 2577:25-2578:4; A10771 at 2349:20-2350:13; A10793 at 2437:5-16. LendingTree's contentions frustrated the purpose of the patents, and the district court therefore clarified that the reference to "mutual assent" in the constructions required a binding agreement for a loan. A10155-159. When LendingTree continued to argue to the contrary, the court clarified its construction, substituting "binding promise" for the term "mutual assent." A10727-729. The court's stated purpose was to convey in plain English, rather than legal terms, the requirement that an offer be capable of acceptance to form a binding loan agreement. *Id.* at 2180:7-2183:12. The district court noted that in the patents, a borrower could accept an offer to form a binding promise for a loan, even though the lender may require additional information for purposes of verifying information in the credit application as part of the closing process. A10721 at 2154:5-15; A10727-728 at 2180:20-2182:22.

## C.    Invalidity Due to Improper Inventorship

The evidence at trial showed that LendingTree's CEO, Doug Lebda, and his business partner, Jamie Bennett, conceived the claimed invention prior to the involvement of the named co-inventor, Richard Stiegler.  Lebda conceived of the filtering concept disclosed in the asserted patents as early as 1995.  A10275 at 420:6-421:3.  A March 1996 email exchange between Lebda and Bennett details all the steps of the invention except returning competing offers to the user.  A12532-537.  In a subsequent email, Bennett described various methods of securely transmitting an applicant's credit information to lending institutions.  A12538-539.  By March 1997, Mr. Lebda and Mr. Bennett had distilled these ideas into a formal business plan that disclosed all elements of the claimed invention, including the competing offers.    A12540-584; A10673 at 1968:5-1969:6; A10993 at 3221:8-3222:8; A10994 at 3223:2-24; A10995-11000 at 3230:1-3248:5.  LendingTree's own technical expert admitted that based on the business plan, the invention had been conceived no later than March 1997.  A11042-045.  This predated the involvement of Lebda's purported co-inventor Stiegler, who joined the company in November 1997.[3]  A10310 at 556:6-10.  Following the presentation of evidence, LendingTree filed a Rule 50(a) motion as to infringement and invalidity, but did not move as to

---

[3] Lebda claimed at trial that Stiegler began "advising" the company in July 1997, still after the March 1997 conception.  A10277 at 427:21-428:4.

invalidity under Section 102(f) or otherwise challenge the sufficiency of the evidence on inventorship.  A7146 at A7153-164.

### D.  The Jury's Non-Infringement and Invalidity Verdict and LendingTree's Attempt to Correct Inventorship

The jury returned a unanimous verdict of non-infringement for each asserted claim.  A7248-249.  The jury also found both asserted patents invalid because they failed to identify the correct inventors.  A7250.  The verdict form, by agreement of the parties, did not require the jury to state the defect in inventorship supporting its invalidity verdict.[4]  A7250; A11211 at 3904:3-3906:25.  After the verdict, LendingTree requested the court poll the jury to determine who they found invented the patents, acknowledging that the evidence could support Bennett's addition, Stiegler's removal, or both.  A11323-324 at A4286:5-4348:8.  The district court declined, because it would require the jury to make findings not required by the agreed verdict form.  *Id.*

LendingTree subsequently requested the district court hold a hearing and order Bennett added as an inventor to both patents.  A7254-55.  Zillow opposed correction, noting that LendingTree did not ask the jury to disclose its fact findings regarding the defect in inventorship.  A7257-62.  In reply, LendingTree argued for the first time that Bennett's omission was the only defect in inventorship supported

---

[4] On appeal LendingTree states that it "does not dispute the jury's conclusion that Bennett is an inventor."  Br. at 8 n.2.  The jury made no such finding, and as discussed below, could have based its verdict on alternative findings.

by substantial evidence.  A7289.  The district court denied the request, determining the evidence supported both the finding that Bennett was improperly omitted and Stiegler was improperly joined.  The court stated it would exercise its discretion to refer correction proceedings to the Patent and Trademark Office.  A30-33.

## SUMMARY OF THE ARGUMENT

LendingTree's appeal asks the Court to find the district court erred in seven different ways.  The district court did not so err.  It construed the four challenged claim terms, "credit data," "offer," "positive credit decision," and the "whereby" clauses, according to the intrinsic evidence and the patents' claimed objective of providing borrowers with multiple offers of credit in response to a single credit application.  Because the district court correctly construed the claims and LendingTree did not challenge the sufficiency of the evidence of non-infringement under the court's constructions, the jury verdict of non-infringment should stand.

The district court did not abuse its discretion in its evidentiary rulings.  It disallowed two cross-examination questions that challenged its claim constructions and misrepresented the specification.  It allowed Zillow to question witnesses about LendingTree's prior inconsistent statements and testimony that were already admitted in evidence without objection.  These statements asserted facts regarding mortgage lending and the LendingTree system, and did not depend on claim constructions from other cases.  Moreover, the court's rulings could not have preju-

diced LendingTree, as it had ample opportunity to present its infringement position and offer context for its prior statements.

The district court did not err in declining to order correction of the patents to name different inventors. 35 U.S.C. Section 256 leaves the correction remedy to the court's discretion, and also restricts it to circumstances in which the error can be corrected. The district court correctly determined the jury's general verdict of invalidity could rest on several different findings. Having done so, the court could not hold a separate equitable proceeding on correction that would displace the jury's determination.

The district court erred, however, by denying Zillow's motion for summary judgment under 35 U.S.C. Section 101 after trial and without a written order. The asserted claims of the '594 and '816 patents claim ineligible subject matter. They recite the use of an intermediary to coordinate credit applications and present offers in return. This is the abstract idea of a credit application clearinghouse, no different, for example, from the traditional role of a mortgage broker. The patents' only advance is to apply the process on generic networked computers. They lack an inventive concept sufficient to transform the abstract idea into a patent-ineligible application.

**ARGUMENT**

## I. THE COURT SHOULD AFFIRM THE JURY VERDICT OF NON-INFRINGEMENT.

"An inventor is entitled to claim in a patent what he has invented, but no more. . . . Therefore, in construing a claim there are two limiting factors—what was invented, and what exactly was claimed." *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1256 (Fed. Cir. 2012). The patented invention purports to allow a user to complete an online loan application. The application is sent to lending institutions that reply as to whether they have accepted or rejected it, allowing the user to select from competing credit offers. A530 at 2:21-25. Accordingly, the district court construed the disputed claim terms to require that lenders receive sufficient data to make their decision, and that their offers of credit be capable of acceptance by the user.

On appeal, LendingTree challenges four claim constructions:

- **credit data**: information entered on the qualification form sufficient for a lending institution to extend or deny credit.

- **offer**: a proposal to extend credit that can be accepted by the user to create mutual assent.

- **positive credit decision**: a proposal to extend credit that can be accepted by the user to create mutual assent.

27

- The "**whereby**"[5] clauses:  the selected lending institutions simultane-
  ously compete by providing offers for credit to the computer user via
  the computer network [or Internet].

Br. 12-36.  LendingTree seeks to claim a lead generation system not invented or
disclosed in the patents.  The district court correctly construed the disputed terms
based on the intrinsic evidence, and the Court should affirm those constructions
and the verdict of non-infringement.[6]

### A.    The District Court Properly Construed "Credit Data."

In the patents, the claimed methods require a user to enter credit data onto an
electronic credit application sufficient for lenders to make offers of credit to the
user.  For example, claim 1 of the '594 patent requires, "receiving a plurality of
credit data," transmitting an electronic credit qualification form comprising that
credit data to lending institutions, and "receiving a plurality of positive credit deci-
sions from said plurality of lending institutions associated with a match of said
credit data regarding an offer of credit or a loan to the Internet user."  A514 at Cl.
1; *see also* A533 at Cl. 3.  Thus, in the context of the claims, the "credit data" re-

---

[5] *See* A514 at Claim 1("whereby said lending institutions associated with a match
of said credit data compete with each other for business with the Internet user");
A533-534 at Claims 1, 22 ("whereby the selected lending institutions compete with
each other for business with the computer user").

[6] LendingTree did not contend on appeal that insufficient evidence supported the
non-infringement verdict under the court's constructions.  *See, e.g.*, Br. at 2, 7-8.
36.

ceived by a lender must be sufficient to allow the lender to decide to extend credit.
The district court correctly construed "credit data" as requiring sufficient information for a lender to decide whether to extend credit.

The specification provides "the single best guide to the meaning of a disputed term" and is "usually dispositive." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315
(Fed. Cir. 2005).  Here, it states the invention "provide[s] a fast, convenient process to apply for credit from a large number of lending institutions."  A511 at 1:49-
50; A530 at 1:57-58.  Again, the "credit data" provided by prospective borrowers
on the credit application must be adequate for lenders to extend credit—otherwise
the invention fails to achieve its purpose.

The specification confirms this in greater detail throughout.  The user inputs
"credit data" onto a loan application or other type of credit application.  A530 at
2:9-15.  On completion of the application, the invention matches a filter to the
"credit data" entered.  *Id.* at 2:16-17.  In fact, the specification refers to "credit data" interchangeably with the "data from the completed application."  A531 at 4:31-
32, 35-36; 4:14-16 ("the prospective borrower inputs information onto the application"); 4:53-55 ("computer runs a filter to match completed application . . . against
present criteria established by each lender"); 4:58-60 ("The process for matching
borrower's application . . . to lender criteria").

The specification also recites that a lending institution decides whether to extend credit based on the "credit data." In particular, the summary of the invention states that the system sends the filtered application to a list of matching lending institutions.[7] "These lending institutions then reply as to whether the application has been accepted or rejected." A511 at 2:13-17; A530 at 2:21-25.

The figures and their descriptions provide further confirmation that lenders decide whether to extend credit based on the credit data. Figure 1, which shows an overview of the method of the invention, provides that at stage 8 in the claimed process the "Lender Accepts/Denies the Application."



A501 at Fig. 1, stage 8. In describing Figure 1, the specification recites: "In stage **8** the lender processes the application and can either accept or deny it."

Figure 10 further depicts this stage, showing that the lending institution approves or denies the borrower's credit application:

---

[7] *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329-30 (Fed. Cir. 2007) (Summary of the Invention section "particularly instructive" for construing claim terms).



A508 at Fig. 10. "In step **71** *the lender approves or denies application* **115**. If the lending institution approves application **115** it attaches an approval to the record file in step **73**. Alternatively if the lending institution denies application **115**, then in step **72** it attaches a denial to the record file." A513 at 5:59-64.

Figure 8 states the Lending Institution's criteria for extending credit are compared against the user's "credit data." A506.



"In step **38**, program **10** instructs computer **100** to read all of the *lending institution's criteria for extending credit*." A512.

The prosecution history also supports the district court's construction. During prosecution, LendingTree indicated that lenders would use the "credit data" submitted by prospective borrowers on a single application to make and return

31

credit decisions. [8]   A1439.   It acknowledged the prior art disclosed collection of credit data from a potential borrower and its transmission to a lender.[9]   *Id.;* A13066-067.   In each prior art reference, the collected data had to be sufficient for the lender to offer a loan to the borrower.   In one reference,[10] the "credit application data" collected from borrowers is sent to lenders until one sends "a decision by the lender(s) regarding approval of the application."   A12766 at 1:43-44; A12781 at 32:5-6; *see also* A514 at Cl. 1.   In a second reference,[11] borrower attributes are collected and transmitted to a lender for "loan approval."   A12801 at 3:21-27.   In distinguishing its invention, LendingTree referred to the data collected and used by a lender to approve credit in these references as "credit data." [12]

The claims, specification, and prosecution therefore all support the district court's construction.   The "credit data" collected from the user and transmitted to

---

[8] Although the cited statements come from the prosecution of the '594 patent, they apply with equal force to the same claim limitations in the '816 patent. *See Elkay Mfg. Co. v. EBCO Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999); *Biovail Corp. Int'l. v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001).

[9] Prior art, as part of the prosecution history, is intrinsic evidence. *Phillips*, 415 F.3d at 1317; *see also Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

[10] U.S. Patent No. 5,878,403 ("DeFrancesco").

[11] U.S. Patent No. 5,940,812 ("Tengel").

[12] In distinguishing DeFrancesco, LendingTree noted it was "designed to send out *credit data* one lender at a time so that when a first positive credit decision is received, the process of selecting a lender stops or terminates." A1495. LendingTree likewise commented that Tengel "is designed to send *credit data* to only a single lender and not a plurality of lenders." A1494 (emphasis added).

the lenders must be minimally sufficient for a lender to extend credit (*i.e.*, approve or deny a credit application), as that is the central feature of the claimed invention.

>    **1.    LendingTree's Arguments Against the District Court's Construction Misread the Specification and Prosecution History.**

On appeal, LendingTree offers only two arguments against the district court's construction of "credit data," neither of which is correct. First, LendingTree contends the construction excludes the preferred embodiment of the invention. Br. at 16-19. It argues that:

> "[C]redit data" cannot be sufficient for a lender to extend or deny credit, because the preferred embodiment teaches that lenders will request additional information (*e.g.,* Social Security number) *after* the initial collection of "credit data" on the qualification form.

Br. at 19-20.

However, the lender's collection of *additional* information in stage 10 (for example, "the best time to contact the borrower") does not mean the lender did not have sufficient information to make a decision to extend credit. It did: in the preferred embodiment, it makes such a decision based on the "credit data" in the credit application prior to requesting any additional information. *Compare* A513 at 5:36-38 (describing sending completed credit application **115** to matched lending institutions), 6:2-7 (lender approves or denies application **115**), *with* A513 at 6:61-65.

LendingTree's argument depends on showing that a lender requires some additional information to make its decision that it did not receive in the credit application.  In the district court, it argued that the lender did not receive the borrower's social security number as part of the credit application, which the parties agree a lender requires to decide whether to extend credit.  However, the specification refutes LendingTree's argument, as it states that the system collects the social security number as part of the "credit data" in the credit application.  Specifically:

- At stage 3, the system checks the user's social security number in the credit application.  A512 at 4:3-11.  Figure 3B, excerpted below, depicts this step:



- At stage 5, the system uses the credit data to obtain a credit score.[13]  *Id.* at 4:32-36; A501 at Fig. 1; *see also* A504 at Fig 5 and A512 at 4:32-36 ("In FIG. 5, . . . computer **100** obtains a Fair Isaac Credit Score from computer **500** based upon the data sent to computer **500**.").  This step requires the system to have the user's social security number, as a FICO score will not issue

---

[13] Dependent Claim 4 of the '594 Patent also expressly recites the step of obtaining a FICO Score based on the credit data.  A514 at Cl. 4.

without it.  A10358 at 743:16-17; A10761 at 2308:8-2309:23.  Figure 5, ex-

cerpted below, depicts this step:



- At stage 6, the system selects the lenders to which it will send the credit ap-

  plication.  A513 at 5:18-32.

- At stage 8, it sends the application to the lenders, which can then respond

  with an offer.  *Id.* at 5:43-46.

In the preferred embodiment, then, the "credit data" received by the lender in-

cludes the social security number, and the lender receives it prior to making any

offer of credit.  There is no missing "additional information" required to make an

offer.

That the loan does not close until the borrower delivers signed documents is

also beside the point.  *See* Br. at 19, citing A514.  As the district court acknowl-

edged, a loan does not arise automatically on the borrower's acceptance of the of-

fer, but instead requires verification and execution of the loan agreement.  A10874

at 2747:5-2749:19.  In its argument, however, LendingTree seeks to conflate "clos-

ing" a loan—*i.e.,* memorializing and funding it—with the lender's decision to offer

credit.  *See* Br. at 19.  The preferred embodiment does not describe any infor-

mation that the lender needs to extend credit that it does not receive before making an offer. The district court's construction therefore does not exclude the preferred embodiment.

Second, LendingTree contends the court's construction of "credit data" imports a claim limitation—"the requirement to extend credit"—that it removed during prosecution. Br. at 20. It does not. The original claim 1 of the '594 patent did not include a "requirement to extend credit." *Compare id. with* A1630. The amendment LendingTree cites merely changed "notification . . . regarding a decision whether to extend an offer of credit or a loan . . ." to " . . .positive credit decisions . . . regarding an offer of credit or a loan . . ."[14] The amendment in no way weakened the requirement that the credit data must be sufficient for the lender to make a decision to provide an "offer of credit or a loan." *See* A514 at Cl. 1 (h); A1497 ("[T]he present invention is designed to promote direct competition be-

---

[14] Prior to amendment:

> g) receiving [a notification] from [the selected ones of] said plurality of lending institutions regarding [a decision whether to extend] an offer of credit or a loan to the [consumer]

As amended:

> g) receiving a plurality of positive credit decisions from said plurality of lending institutions associated with a match of said credit data regarding an offer of credit or a loan to the Internet user

*See* Br. at 20, *citing* A2239; *see also* A1495-96(explaining amendment).

tween lenders by providing a plurality of positive credit decisions which are displayed to the Internet user. The Internet user can then select a loan or an offer of credit from the plurality of positive credit decisions."). The district court's construction of "credit data" does not read back into the claims any removed limitation.

### 2.    LendingTree Offered No Viable Alternative Construction of "Credit Data."

LendingTree proposes that any facts bearing on creditworthiness can comprise "credit data." Br. at 20. But this does not present a reasonable alternative construction. A construction that allows "credit data" to include any facts about creditworthiness does not ensure that lenders receive enough information to make the positive credit decision required by the claims. For example, information about a user's timely credit card payments might comprise "credit data" under LendingTree's construction, yet this information is not enough for a lender to decide to extend credit. The proposed construction therefore renders the invention inoperable. *See Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.,* 389 F.3d 1370, 1378 (Fed. Cir. 2004).

The Court must also avoid a construction that will result in an indefinite claim. *See Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003). LendingTree's construction, however, only makes the claims more ambiguous, as a person of ordinary skill in the art would not know what data

the alleged invention covers. LendingTree itself does not articulate what data would constitute "data reflecting the potential creditworthiness of the user."[15] Under LendingTree's proposed construction "competitors cannot avoid infringement, defeating the public notice function of patent claims." *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

### 3.    The Court Should Affirm the Judgment of Non-Infringement Based on the Correct Construction of "Credit Data."

An accused instrumentality cannot be found to infringe a patent unless it embodies each and every limitation of that claim. *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1312 (Fed. Cir. 2005); *Canton Bio-Med, Inc. v. Integrated Liner Techs., Inc.*, 216 F.3d 1367, 1370 (Fed. Cir. 2000). Every asserted claim of the patents in suit contains the "credit data" limitation. The trial record shows that Zillow's system does meet this limitation under the court's construction, and LendingTree did not challenge the sufficiency of that evidence on appeal. Therefore, regardless of the other challenged constructions below, if the Court affirms the district court's construction of "credit data," it should also affirm the judgment of non-infringement. *See Verizon Servs. Corp. v. Cox Fibernet Va., Inc.,*

---

[15] In the district court, LendingTree contended that lending institutions require credit reports, appraisals of the subject property, and may also require numerous other types of information before extending credit, including W2s, pay stubs and tax returns. A1231. Yet, it also contended that "credit data" does not necessarily include any of this information. *Id.*

602 F.3d 1325, 1342 (Fed. Cir. 2010) (verdict affirmed where jury had substantial evidence to find non-infringement independently of the disputed limitations); *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1349 (Fed. Cir. 2007) (infringement verdict affirmed on similar grounds).

### B.    The District Court Properly Construed "Offer" and "Positive Credit Decision."

The claims, specification, and prosecution history describe "offers" and "positive credit decisions" as offers to extend credit. As noted above, the patents purport to enable a user to submit a single credit application to obtain multiple offers of credit that a user can accept and then proceed to a loan closing. *E.g.*, A530 at 1:61-65; A533 at 7:4-12. The asserted claims of the '594 patent, and asserted claims 3, 7, claims 7, 9, 11, and 18-21 of '816 patent all require a "decision . . . to offer a loan." The primary prior art references considered by the examiner during prosecution also all describe systems that result in a lender making a decision to extend credit to a borrower on receipt of a credit application. A12787 at Abstract; A12716 at Abstract. The district court properly construed the challenged terms in light of the intrinsic evidence.

Nothing in the claims, specification or prosecution history suggest that "positive credit decisions" or "offers" means "loan terms for which the user *may* qualify." *See* Br. at 22-24, 28, 35. If the terms mean something less than an offer to extend credit, there is nothing for the user to accept and a loan cannot close following

acceptance as the claims require.  Further, the invention would not eliminate re-petitive applications, as users would have to submit an application to each lender to get loan terms for which they *do* qualify.  *See* A511 at 1:50-53.

LendingTree contends that the patents cover a lead generation process that may eventually result in a loan.  Br. at 32.  But the patents do not discuss lead gen-eration; they discuss coordinating loan offers that are capable of acceptance.  The fact that the invention contemplates that *some* users may not qualify for credit from any lender does not show otherwise.  *See* Br. at 32; citing A532-33 at 5:12-17.  The specification is explicit that lenders make offers and positive credit decisions that, when accepted, result in a loan closing, and the constructions must reflect this. *Phillips*, 415 F.3d at 1312 ("Because the patentee is required to 'define precisely what his invention is,' . . . it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'") (cita-tion omitted).

LendingTree's argument that "offers" and "positive credit decisions" cannot be binding because the patents contemplate receiving additional information from the borrower after the lender's decision is wrong.[16]  As discussed above, the addi-tional information requested before closing is not more credit data, as LendingTree implies.  Instead, the *user* can request more information as part of his or her deci-

---

[16] LendingTree mischaracterizes Zillow as contending that no additional infor-mation could be exchanged following acceptance to close the loan.

sion whether to accept the loan.  A532 at 6:49-51 ("In this stage the borrower in-forms the lender of his decision concerning the loan."); A514 at 7:47-51 ("receiv-ing . . . at least one decision from the Internet user . . . comprising an acceptance, denial or *request for more information* regarding a positive decision") (emphasis added).  And the *lender* can request additional information to coordinate the clos-ing of the offered loan (e.g., the "best time to contact the borrower"), and verify the information in the credit application.  A533 at 7:6-11.

LendingTree contends the district court erred in construing both terms to have an identical meaning.  Br. at 26.  However, the doctrine of claim differentia-tion does not require the court give claim terms different meanings if evidence in-dicates otherwise.  *See Retractable Tech. v. Becton, Dickinson & Co.,* 653 F.3d 1296, 1305 (Fed. Cir. 2011); *Andersen Corp. v. Fiber Composites*, 474 F.3d 1361, 1370 (Fed. Cir. 2007).  Here, the terms refer to the identical step described in the specification:  the lender's acceptance of the credit application.  *See Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) (claim terms construed identically where used synonymously in specification).  LendingTree itself moved the district court to construe "offer" and "positive credit decision" identically as "loan terms for which the user may qualify."  A1238, A1240; *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321, 1326 (Fed. Cir. 2013) (con-struing terms identically where parties agreed they are synonymous).

41

Finally, LendingTree contends that a person of ordinary skill in the art would understand "offer" and "positive credit decision" to have the meanings it proposes. Br. at 23-24. The understanding of one skilled in the art regarding the meaning of a claim term is an extrinsic fact requiring deference to the district court's findings. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 843 (2015). LendingTree cites no record evidence in support of its argument, and for good reason, as the testimony of its expert supports the court's constructions. She testified, for example, that a credit decision is "a decision that a financial institution would make in determining whether or not to offer a loan." A12897-898 at 187:24-188:8. The claim construction order does not set forth specific fact findings. A1-2. But to the extent the constructions depend on this fact question, the district court resolved it in Zillow's favor.

## C.    The District Court Properly Construed the "Whereby" Clauses.

The "whereby" clauses require that the selected lending institutions compete with each other.[17] "Claim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Research Plastics v. Fed. Packaging*

---

[17] In the district court, LendingTree made the argument that these clauses did not limit the claims, but it did not raise that argument on appeal. Not only do the clauses recite a substantive requirement beyond the other limitations, during prosecution LendingTree used them to distinguish its claims from the prior art. *See* A2248; *Hitzeman v. Rutter*, 243 F.3d 1345, 1355 (Fed. Cir. 2001).

*Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005).  Here, the claims recite how the lenders compete in the invention:  "by electing to make offers to the computer user."  A533 at claim 7, col. 8:7-9.  Nowhere else do they disclose any alternative form of competition.  Given the presumption that a patent uses claim terms consistently, the district court correctly construed "compete" to require that the selected lenders compete by providing the user with offers for credit over a computer network or the Internet.

LendingTree contends that this construction imports a separate limitation of an offer into claims that do not contain it.  Br. at 28-31.  However, the Court must read the lender competition requirement in light of the specification.  *Phillips* at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction") (citation omitted).  The invention purports to allow a user to "to submit a single credit application to a plurality of lending institutions who then make offers to the customers via the Internet."  A530 at 1:61-65.  In the preferred embodiment, lenders approve or deny loan applications, transmit their decisions back to the system, and, if selected, contact the borrower to close the loan.  A532 at 5:67-6:3; *id.* at 6:61-67; A533 at 7:4-5; A527-529 at Figs. 10-12.  The only lender "competition" that makes sense in light of the specification is making competing offers of credit.

LendingTree contends the clauses should be construed according to their plain meaning. Br. at 30-31. But again, the "plain meaning" must be consistent with the specification. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed.Cir.2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.") (citation omitted). Without considering the specification, the limitation could be met by any conceivable way in which a skilled artisan understands lenders to "compete." This conflicts with the description of the invention and fails to satisfy the public notice requirement. *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) ("Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention.").

### D.    LendingTree Suffered No Prejudice as a Result of the District Court's Claim Constructions.

LendingTree contends that it was prejudiced at trial by Zillow's introduction of evidence under the district court's claim constructions. As set forth above, the district court correctly construed the disputed terms, and as a result, LendingTree suffered no prejudice.

LendingTree also suffered no prejudice from the district court's clarification of its constructions during trial. "The trial court's supplemental definition of a claim term during trial [does not] present a fundamental procedural flaw that jeop-

ardizes the jury's verdict." *Pressure Prods. Med. Supplies v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010). "[D]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."[18] *Id.* (citation omitted).

The district court did not change its constructions during trial. Before trial, LendingTree argued that the mutual assent required under the court's construction of "offer" could be satisfied by a promise to continue discussion. A10158 at 73:11-17. The district court instructed the parties that under its construction it would "not allow a binding promise to be interpreted as a promise to go forward later on." A10730 at 2189:17-23. It provided this clarification in order to prevent LendingTree from arguing claim construction to the jury.

LendingTree also mischaracterizes Zillow as contending at trial that it could not infringe under the district court's construction of "offer" if any information is exchanged after the offer's acceptance to close the loan. Br. at 32-33. Zillow contended only that *credit data* is transmitted to the lender prior to acceptance. And indeed, the preferred embodiment of the patent does not contemplate transmission

---

[18] LendingTree cites no case law in support of its argument, but those it cited in the district court do not hold otherwise. In *Johns Hopkins University v. CellPro, Inc.*, 152 F.3d 1342 (Fed. Cir. 1998) the district court declined to construe disputed claim terms prior to trial. Acknowledging this error, it construed the disputed terms and granted a new trial. In the second trial, the court precluded the defendant from asserting new prior art that had only become relevant in light of the court's post-trial construction. *Id.* at 1357. Here, the district court construed the claims before trial, and its clarification did not change the scope of the claims.

of credit data after a lender has extended its offer. *See, e.g.*, A10723 at 2161:16-2163:6. Zillow did not contend that *no information* would be exchanged after acceptance. Instead, there would be a further exchange at closing to document the loan, after the offer has been accepted. *See, e.g.*, 10721 at 2154:5-15.

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS EVIDENTIARY RULINGS.

LendingTree requests a new trial on the basis of two evidentiary rulings by the district court:

- The court sustained an objection to LendingTree's attempt to ask Zillow's mortgage loan expert questions that implied the specification contradicts the court's claim construction.

- The court permitted Zillow to question LendingTree's witnesses regarding statements it made in past litigation regarding the mortgage loan process and the operation of its own system.

In order to obtain a new trial, LendingTree must show both that the district court abused its discretion in excluding or admitting the challenged evidence and that such ruling prejudiced LendingTree's substantial rights and was not harmless error. *Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1542 (Fed. Cir. 1997). LendingTree failed to make either showing.

A.    **The District Court Properly Prevented LendingTree from Elicit-ing Testimony Regarding Claim Construction.**

LendingTree contends the district court prohibited it from cross-examining Zillow's mortgage expert Marshall Dennis using the specification of the patents. Br. at 37. However, the court excluded only two questions based on the specification: whether the preferred embodiment showed that the borrower does not provide a Social Security number to the lender until after his acceptance of the lender's offer. In its brief, LendingTree discusses one of these questions:

> Q. The sentence [from the specification for the '816 Patent] says that, "The lending institution has the borrower's name and the Social Security number" . . . Now, you can understand that the borrower's name and Social Security number were not sent prior to acceptance, right?

*See* Br at 38; A10768 at 2337:3-13.[19]  The court properly sustained the objection because the questions misstated the evidence and contested the court's claim construction before the jury.

1.    **The Excluded Questions Improperly Placed the District Court's Claim Construction at Issue.**

Evidence conflicting with the court's claim construction is properly excluded as irrelevant and prejudicial. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see also Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009).  In fact, a district court

---

[19] LendingTree's brief does not cite or discuss the second variation of this question excluded by the district court. It asked whether the specification shows that the social security number is only provided to one lender—*i.e.*, the lender whose offer the borrower has already accepted. *See* A10769 at 2341:3-8.

commits reversible error if it allows a testifying expert to argue claim construction to the jury. *See CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172-73 (Fed. Cir. 2005).

LendingTree's cross-examination question was an attempt to present a claim construction argument to the jury. During claim construction, it contended that "offer" should not be construed as a binding offer to extend credit, but rather a nonbinding proposal to move forward. Similarly, "credit data" could be *any* information reflecting creditworthiness and it did not have to be sufficient for a lender to decide whether to extend credit. In support of its position, LendingTree argued:

- Lenders require a social security number to make a binding offer to extend credit.

- The specification states that the lender has the borrower's social security number at stage 10 of the patented method.

- But it makes an "offer" based on receipt of "credit data" at stage 8.

- Therefore an "offer" cannot mean a binding offer, because the lender lacks the social security number at the offer stage (stage 8). And "credit data" cannot be information sufficient to decide whether to extend credit for the same reason.

A10034 at 139:5-25. As discussed in greater detail above, this argument contains a flawed premise and the district court correctly rejected it. *See* A10038 at 155:24-156:3; A10769-770 at 2341:21-2343:19. The specification states that in the preferred embodiment, the system checks the borrower's social security number in the application at stage 3. A512 at 3:8-10; 4:8-11; Fig. 3B. At stage 5, the system obtains the borrower's FICO credit score using the application, which also requires the social security number. *Id.* at 3:11-14; A10398 at 3004:15-18.[20] Accordingly, the credit application provided to lenders in stage 8—before the "offer"—contains a social security number.

Under the court's construction, "credit data" must include information sufficient for a lender to extend or deny credit. Dennis opined that mortgage lenders do not make that decision without a borrower's name, social security number, date of birth, and the subject property address. A10760-61 at 2303:22-2304:6, 2305:14-2307-3, 2310:16-19. Accordingly, "credit data" must include at least that information to meet the court's construction.

LendingTree's questions stated that in the preferred embodiment the lender accepts an application without a social security number. They misstated the evidence, because as shown above, the specification states exactly the opposite. They

---

[20] Testimony of LendingTree's infringement expert Mr. McAlexander: (Q. . . . And in fact, in stage 5, the system uses that social security number to get a Fair Isaac Credit Score, correct? A. That is also correct, yes.").

also challenged the district court's claim constructions, which required "credit da-
ta" sufficient for the lender's decision to make a binding "offer."[21]  This effectively
tasked the jury with claim construction and contravened Federal Circuit law, and
led the district court to reprimand LendingTree.  *O2 Micro*, 521 F.3d at 1362.  The
district court did not abuse its discretion by preventing LendingTree from present-
ing the two misleading questions to the jury.

### 2.    LendingTree Suffered No Prejudice from the Exclusion of Its Questions.

The district court correctly prevented LendingTree from asking two mislead-
ing questions that contested claim construction.  But if this Court rules otherwise,
LendingTree still suffered no prejudice warranting a new trial.  *See Kolmes*, 107

---

[21] Not surprisingly, most of LendingTree's cited authorities discuss the proposition
that a *claim construction* should not exclude the preferred embodiment.  *See Ma-
rine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1369-70 (Fed. Cir.
2012) (en banc); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.
Cir. 1996); *Tex. Instruments, Inc. v. U. S. Int'l Trade Comm'n*, 805 F.2d 1558,
1563 (Fed. Cir. 1986).

LendingTree also cites two district court cases, *Linear Tech. Corp. v. Micrel, Inc.*,
No. C-94-1633 MHP, 2006 U.S. Dist. LEXIS 96860 (N.D. Cal. Jun. 9, 2006) and
*Cimcore Corp. v. Faro Techs., Inc.*, No. 03 CV 2355-B(WMC), 2007 U.S. Dist.
LEXIS 17936 (S.D. Cal. Mar. 12, 2007).  In *Linear Tech.*, the district court looked
to the specification because its limited claim construction did not resolve the par-
ties' dispute over the scope of the claims—essentially engaging in further claim
construction.  *Linear Tech.*, 2006 U.S. Dist. LEXIS at *46-47; *237-38.  In
*Cimcore*, the district court permitted demonstrative evidence of the preferred em-
bodiment to assist the jury in understanding the relevant technology, not as part of
infringement analysis.  *Id.* at *7.

F.3d at 1542.  First, the district court ruled LendingTree could cross-examine Mr. Dennis using the specification so long as it did not contradict claim construction. A10771 at 2349:20-2350:12.  LendingTree proceeded to use the patents to question Dennis regarding his knowledge of computer technology.  (LendingTree attempts to present this as a flaw in Dennis' testimony, but Dennis served only as an expert on mortgage lending, and did not opine on any computer technologies at issue. *See* A10770 at 2345:13-14, 2346:21-23.  Zillow presented the testimony of a second expert, Glen Weadock, on those subjects.)  After doing so, LendingTree declined further cross-examination.  LendingTree cannot use its own trial strategy to attribute prejudicial error to the district court.

Second, LendingTree presented both its infringement theory and interpretation of the preferred embodiment through other witnesses.  LendingTree witnesses testified that lenders could offer to extend credit without the borrower's social security number.  A10651 at 1882:11-16; A10775 at 2363:22-2364:1; A10783-784 at 2398:20-2399:9.  They also testified, walking through the steps of the invention, that the preferred embodiment itself purportedly demonstrated that a social security number was not required.  A10784 at 2399:11-17; A10785-786 at 2406:2-2409:12 (describing how lenders purportedly extend "offers" before receiving personal information of the borrower).  The district court gave LendingTree wide latitude to present its view of the specification, which the jury ultimately did not credit.

51

LendingTree suffered no prejudice due to the district court's exclusion of its two questions.

**B.    The District Court Properly Admitted Evidence of LendingTree's Prior Testimony and Inconsistent Litigation Positions.**

In past litigation LendingTree represented the following regarding the mortgage loan process and the operation of its own system:[22]

- For a lender to decide to extend credit to a mortgage borrower, it requires all of the information requested in the URLA Form 1003.  A12076; *see also* A10398 at 897:11-25.

- A lender would not approve or deny a loan without first obtaining a credit report, which in turn requires that the lender possess the borrower's social security number.   A12196 at 987:25-988:3, 988:4-9; A12260 at 1071:5-7; *see also* A12255 at 1051:5-7; A10612 at 1735:9-19.

- A lender could not decide to extend credit for a mortgage without knowing the street address of the subject property.   A12076; A12260 at 1071:5-7; *see also* A10612 at 1735:9-19.

- The LendingTree system identified prospective customers to lenders, but did not submit completed loan applications to them or provide offers in

---

[22] LendingTree did not identify each challenged statement in the record.  Zillow presents them here based on the citations in LendingTree's opening brief.

return.    A12135 at 734:18-735:3; A12071, A12077-079; A12161 at 837:17-24; A12438; A12459; *see also* A10392-93.

- The LendingTree system did not collect information sufficient for a lender to make a decision to extend credit.  A12069; A12136 at 737:9-12.

Each statement was admitted in evidence without objection from LendingTree, and LendingTree has therefore waived its right to challenge their admission on appeal. Each statement also contradicts LendingTree's infringement position at trial, and therefore the district court properly admitted them or allowed their use for impeachment.  *See* Fed. R. Evid. 801(d)(1) & (d)(2).

### 1.    LendingTree Waived Its Objections to the Challenged Statements.

The district court did not exclude the challenged statements because LendingTree did not object to them at trial.  Zillow discussed them in opening argument,[23] and the underlying documents that contain them were entered in evidence without objection.[24]

---

[23] *See* A10255 at 341:7-11; A10256 at 342:11-25, 344:8-345:3.

[24] The district court deemed exhibits admitted if they were published to the jury without objection.  A10290 at 481:2-20.  The exhibits containing LendingTree's prior statements were each admitted in this manner.  *See* A12061-086 (DX285, admitted at A10394, 882:11-883:1), A12126-241 (DX335, admitted at A10391, 870:12-871:4), A12242-360 (DX336, admitted at A10610-11, 1728:11-1729:4), A12361-448 (DX448, admitted at A10396, 889:19-890:23), A12449-486 (DX449, admitted at A10395-96, 888:20-889:18).  The district court also allowed the parties to stipulate to the admission of exhibits.  A10298-299 at 509:23-510:2.  Exhibits DX 335 and 336 were also admitted by stipulation.

A party fails to preserve error unless it timely objects and states the specific ground for the objection. Fed. R. Evid. 103(a). LendingTree has thus waived its objections to the statements and may not assign error to their admission on appeal.[25] *See Novo Nordisk A/S v. Becton Dickinson & Co.*, 304 F.3d 1216, 1220 (Fed. Cir. 2012) ("'counsel . . . cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were prejudicial.'" (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39 (1940))).

### 2. The District Court Properly Admitted the Challenged Evidence as Prior Testimony and Prior Inconsistent Statements.

At trial the parties did not dispute that Zillow's accused system does not collect all the information requested in the URLA Form 1003, including the borrower's social security number or the subject property address, nor does it obtain the borrower's credit report. A10944 at 3029:9-13; A10763 at 2317:5-2318:1. Nevertheless, LendingTree argued that Zillow's system collects "credit data"—*i.e.*, information sufficient for a lending institution to make a decision to extend or deny

---

[25] LendingTree did request a continuing objection as to any question that used the claim constructions from another case. A10396 at 890:4-23. However, LendingTree requested this objection after the admission of the statements. *See* footnote 24, above. LendingTree also cannot construe its objection to introduction of claim constructions as preserving any other objection to the statements. *See* Fed. R. Evid. 103(a); *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1228-29 (Fed. Cir. 2014).

credit. LendingTree's prior statements that a lender would not make such a decision without a credit report or the Form 1003 information impeach this testimony.

Similarly, the uncontroverted trial record showed Zillow's system provides a sales lead—identification of an interested consumer—rather than a loan application or a binding agreement for a loan. Nevertheless, LendingTree introduced testimony that in Zillow's system lenders make offers—*i.e.* binding proposals to extend credit that can be accepted by the user. LendingTree's prior testimony that a sales lead differs from a loan application impeaches the testimony. A10392 at 876:5-12.[26]

LendingTree contends the district court should have excluded the statements because they were made in cases that involved different patent claims and accused products.[27] Br. at 42. But ultimately, the challenged evidence relates to facts about mortgage lending and how LendingTree's system works. It does not depend on the claim constructions in the other cases or any other legal issue from them. And as

---

[26] "[I]n any sales business, a lead is a prospective customer. It's a sales lead. It's something you need to follow-up on. Something you need to convince the consumer that you want to do business with them. And then I go on to say 'very different than a loan application, when a consumer submits a loan application, they are first of all giving much more information.'"

[27] LendingTree did receive the opportunity to explain to the jury why it believed those differences were relevant. A10748-749 at 2263:4-2266:18.

the district court found below, Zillow's questions did not invoke the claim constructions from those other cases.  A10396 at 890:4-9.

## III.   THE DISTRICT COURT CORRECTLY DECLINED TO ORDER CORRECTION OF THE PATENTS-IN-SUIT.

LendingTree contends that 35 U.S.C. Section 256 required the district court hold a separate hearing to correct inventorship following the jury verdict.  It did not, for two independent reasons.  First, the statute gives the PTO and the district court concurrent jurisdiction over corrections.  Nothing in it mandates that the district court exercise its jurisdiction, and here the district court did not err by declining to do so.  Second, the statute requires a correctable error.  Here, multiple potential errors support the jury's general verdict of invalidity for failure to name the proper inventors.  The district court found that the verdict did not identify a correctable error and declined to overturn the verdict through a separate bench trial.

### A.   The District Court Had Discretion Over Whether to Order Correction of the Patent.

Under Section 256 the district court had discretion regarding whether to order correction of the patent.  The statute provides:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error. . . .

The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256.[28]  The section gives concurrent authority to the PTO and the district courts to order correction.  *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1356 (Fed. Cir. 2003).  While it specifies the circumstances justifying correction, it does not direct one or the other to assert jurisdiction over a particular inventorship error.[29]

The section also uses the permissive "may" rather than the mandatory "shall."  This Court has held that Congress' use of "may" in the Patent Act reflects its preference to confer discretion to the decision maker.  *Eli Lilly & Co. v. Bd. of Regents of the Univ. of Wash.*, 334 F.3d 1264, 1267 (Fed. Cir. 2003) ("[t]he plain meaning of this statute demonstrates that Congress has expressly indicated its preference that the declaration of an interference pursuant to § 135 be discretionary"); *Barton v. Adang*, 162 F.3d 1140, 1144 (Fed. Cir. 1989) ("[t]he plain meaning of th[e] statute is clear from the use of the permissive term 'may' that the Commission has discretion whether to declare an interference"); *see also Kingdomware Techs. Inc. v. United States,* 754 F.3d 923, 931 (Fed. Cir. 2014), *cert. granted*, 135 S.Ct. 2857 (2015) ("the 2003 Veterans Act . . . importantly, changed the permis-

---

[28] The pre-America Invents Act version of 35 U.S.C. § 256 also requires that any error to be corrected must have been made without deceptive intention.

[29] The PTO's regulations also lack such direction.  *See* 37 C.F.R. 1.324(a).

sive term 'may' to the mandatory term 'shall'").[30]  In other words, by using "may," the statute authorizes, rather than requires the district court to order correction.

*Pannu v. Iolab Corp.*, 155 F.3d 1344 (Fed. Cir. 1998), relied on by LendingTree, does not expressly consider whether Section 256 mandates the court to act.  It notes a district court must order correction, "if a patentee demonstrates that inventorship can be corrected."  *Id.* at 1350.  But that statement assumes the district court has already taken jurisdiction over the patentee's correction claim.  Elsewhere *Pannu* states only that the patentee must have the "opportunity" to correct inventorship, without specifying whether that opportunity must take place in the district court or instead can occur through either of the means available under the statute.  *Id.* at 1350-51.  Given this ambiguity, *Pannu* should not be read to conflict with the statute itself, which in any event controls.

Finally, the Court should not read out the plain meaning of the statute based on the fact Section 256 has a remedial purpose.

> Th[e] maxim [that remedial statutes should be construed liberally] is useless in deciding concrete cases.  Every statute is remedial in the sense that it alters the law or favors one group over another. . . . Knowing that a law is remedial does not tell a court how far to go. Every statute has a stopping point . . . .  A court must determine not only the direction in which a law points but also how far to go in that direction.

---

[30] These holdings are consistent with Supreme Court teaching on statutory construction.  *See Anderson v. Yungkau,* 329 U.S. 482, 485 (1947) ("When the same Rule uses both 'may' and 'shall', the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory.").

*Stomper v. Amalgamated Transit Union, Local 241*, 27 F.3d 316, 320 (7th Cir. 1994). Here, Congress created a remedy that either the PTO or the court could provide. It went no further: it did not direct the district court to take jurisdiction over every request for correction. LendingTree has already petitioned the PTO for correction. Br. at 60 (citing A12509-12630). This satisfies the statute's "remedial purpose." The statute did not require the district court to conduct a redundant correction proceeding, and the Court should not so order.

###### B.    The District Court Correctly Determined It Could Not Correct the Patents Based on the Record at Trial.

Even if the statute did not leave correction to the district court's discretion, it restricts that remedy to circumstances where correction is possible. The statute provides:

> The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred *if it can be corrected* as provided in this section.

35 U.S.C. § 256 (emphasis added); *see also Pannu*, 155 F. 3d at 1350. Here, the district court expressly determined that because of the general verdict rendered by the jury, based on the agreed verdict form, it could not identify the true inventors and correct the error. A31-33.

### 1.    The Jury Could Have Based Its Invalidity Verdict on Multiple Errors.

First, the district court determined that substantial evidence supports several potential jury findings: that Bennett was nonjoined, that Stiegler was misjoined, or both.[31]  A31.  In the district court, LendingTree agreed.  It argued that the jury's verdict left open all three possibilities.  A11323 at 4286:9-11.  It asked the court to poll the jury regarding the identity of the proper inventors.  *Id.* at 4286:5-7.  And it argued that it needed the jury poll to correct the patents.  *See id.* at 4286:11.

LendingTree concedes on appeal that Bennett was nonjoined as an inventor, but now contends that the jury could not have found Stiegler was misjoined.  Br. at 57.  LendingTree did not challenge the sufficiency of the evidence regarding improper inventorship in its pre-verdict motion for judgment as a matter of law,[32] and has thus waived any subsequent challenge to it.  *See* Fed. R. Civ. Proc. 50(a)(2); *P.R. Chunk, Inc. v. Martin Marietta Materials, Inc.*, 170 F. App'x 288, 290 (4th Cir. 2006); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008).

---

[31] LendingTree's argument that the district court refused to consider whether the circumstances justified correction is therefore incorrect.  *See* Br. at 54.  It is precisely because the court determined it could not correct the error that it declined further action.  *See* A31, A33.

[32] LendingTree moved only as to invalidity on three unrelated grounds: inequitable conduct; invalidating prior sales under Section 102(b); and obviousness pursuant to Section 103(a).  A7146 at A7160-164.

Moreover, substantial evidence supports a finding that Stiegler was mis-joined. "[O]ne does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (citing *Sewall v. Walters*, 21 F.3d 411, 416-17 (Fed. Cir. 1994)). This requires more than merely exercising ordinary skill in the art or explaining known concepts to the real inventors. *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997); *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 981 (Fed. Cir 1997). This remains true even if the specification expressly discloses an embodiment to which that person contributed ordinary skill. *See id.*

The trial record shows that Stiegler helped reduce an already conceived invention to practice. Lebda and Bennett conceived the invention no later than March 1997. A March 1996 email exchange between them detailed all steps of the invention except returning competing offers to the user. A12536. They conceived of the last step by the time of a March 1997 business plan, which discloses all steps of the inventions. A12540-584. LendingTree's witnesses, including its expert, admitted at trial that these documents described the features of the patented invention, and matched the disclosures in the patents. *See, e.g.*, A10334-336 at 645:2-4, 16-24, 650:12-16, 651:11-14, 654:7-12, 656:21-657:5 (Ms. Lebda); A12532-537; A10658-663 at 1910:24-1911:7, 1913:7-20, 1914:17-1916:6, 1916:20-1917:15,

61

1922:1-1923:1, 1927:2-5, 1928:20-25 (Mr. Lebda); A10671 at 1962:8-22 (Mr. Lebda); A11043-45 at 3417:11-3426:5 (Mr. McAlexander).

However, Mr. Stiegler did not begin work with LendingTree until at least July 1997, and was not hired as an employee until November 1997—months after Lebda and Bennett had conceived the inventions.[33]  *See* A10306 at 541:11-16; A10327 at 618:18-23, *see also id.* at 616:21-23; A10342 at 679:10-12; A10328 at 623:3-13. Zillow's expert opined based on these facts that Stiegler was improperly named. A11012-013 at 3295:1-3296:13. LendingTree's own expert also admitted that the inventions were conceived as of March 1997, and that Stiegler could not be an inventor if his involvement began in July. A11043-045 at 3417:11-3426:5. This evidence was sufficient for a reasonable juror to find Stiegler misjoined under the clear and convincing standard.

On appeal, LendingTree contends the jury could not have found that Stiegler was misjoined because it offered testimony that he contributed "filtering technology" and "back end" systems. Br. at 58. On a challenge to the sufficiency of the evidence, however, the court must view the evidence in a light most favorable to Zillow. *See Akamai Techs. v. Cable & Wireless Internet Servs.*, 344 F.3d 1186,

---

[33] LendingTree states on appeal that Stiegler became involved with LendingTree in "Spring 1997" and signed an employment agreement in July 1997. Br. at 48. However, the cited testimony states only that Lebda "met" Stiegler that spring, and that he became "an advisor" in July. *See* A10277 at 427:21-428:4.

1198 (Fed. Cir. 2003); *z4 Techs.*, 507 F.3d at 1346-47. It should disregard the evidence offered by LendingTree as the jury did not have to credit it. *See Versata Software, Inc. v. SAP Am., Inc.,* 717 F.3d 1255, 1262 (Fed. Cir. 2013); *Millner v. Schweiker*, 725 F.2d 243, 245 (4th Cir. 1984) ("[I]t is immaterial that eight medical witnesses disagreed . . . , provided that one such witness gave sufficient probative evidence.").

Further, LendingTree's characterization of this evidence as uncontroverted is also incorrect. While Lebda attributed filtering to Stiegler, he also expressly claimed to have conceived of the filtering step himself in 1995. A10275 at 420:9-421:3. The 1997 business plan also discloses the filtering step. A10671-672 at 1961:16-1963:14. The patents themselves do not claim any advancement in existing computing or Internet technologies. The LendingTree witness testimony tends to support the conclusion that Stiegler contributed to "back end" systems by explaining to the inventors concepts well known in the then-current state of the art. Br. at 58; A10341 at 673:3-5; A10343 at 680:4-9. *Hess*, 106 F.3d at 981.

LendingTree contends that the trial on inventorship was limited to the asserted claims. Br. at 59. This is incorrect. Zillow's inventorship defense called into question the entire patents. *See* 35 U.S.C. § 102(f). While the jury gave its infringement verdict only as to the asserted claims, it considered invalidity as to each patent. *Compare.*, A7248 at I.1. *with* A7251 at IV.1. *and* A7250 at III.1.

Moreover, the evidence and testimony presented on inventorship simply was not limited in the way LendingTree claims. *See* A10673 at 1968:5-1969:6; A10993 at 3221:8-3222:8; A10994 at 3223:2-24, A10995-11000 at 3230:1-3248:5; A11043 at 3417:11-17; 3417:25-3418:6; *see also id.* at 3418:15-18; A12645 at 238:5-11; A11045 at 3424:21-25 ("*every aspect of the claimed inventions* was provided in March 1997 by Mr. Bennett and Mr. Lebda") (emphasis added).

### 2.    The Court Cannot Supplant the Jury's Fact Determination on Inventorship.

Section 256 provides an equitable remedy that shares overlapping fact questions with a defense of invalidity for improper inventorship. *See Shum v. Intel Corp.*, 499 F.3d 1272, 1277-79 (Fed. Cir. 2007). When legal and equitable claims involve common fact issues, the jury must determine the legal claims first, and the court is bound by the jury's determination on the common issues. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959). The court errs as a matter of law by making findings that conflict with those necessarily determined by the jury. *See Cabinet Vision v. Cabnetware*, 129 F.3d 595, 600 (Fed. Cir. 1997); *Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am.*, 16 F.3d 410, 1994 WL 34745, at *3 (4th Cir. 1994); *see also In re Lewis*, 845 F.2d 624, 629-30 (6th Cir. 1988).

In *Cabinet Vision*, for example, the defendant asserted both an inequitable conduct defense and a *Walker Process* counterclaim. 129 F.3d at 597. The parties

submitted a stipulated verdict form that asked the jury whether the patentee engaged in inequitable conduct. *Id.* at 598. If it answered no, the form directed the jury to skip additional interrogatories on the *Walker Process* claim. *Id.* Following trial, the jury found the patentee did not commit inequitable conduct. *Id.* at 599. Nevertheless, the trial court held that it could treat that verdict as advisory and that the defendant could dismiss and re-file the *Walker Process* claim. *Id.* On appeal, this Court found that given the design of the jury instructions, the jury necessarily addressed the fact questions underlying both the inequitable conduct defense and the antitrust counterclaim. *Id.* at 600-601. The trial court was bound by the jury's determination, even though the verdict form did not disclose its precise basis. *Id.*

Here, the parties jointly submitted the issue of invalidity for failure to name the correct inventors to the jury and requested a general verdict. A7250. LendingTree could have requested a special verdict with interrogatories regarding the basis for the jury's finding, but it did not. In reaching the general verdict of invalidity, the jury necessarily made findings as to the identity of the correct inventors. Based on the record, the district court determined that the jury could have found that Bennett was nonjoined, that Stiegler was misjoined, or both. The patents were therefore not correctable: the district court could not conduct a separate equitable proceeding that displaced the jury's fact findings on inventorship.

## IV. LENDINGTREE'S PATENTS CLAIM INELIGIBLE SUBJECT MATTER UNDER 35 U.S.C. § 101.

Abstract ideas, laws of nature, and natural phenomena form the "basic tools of scientific and technological work," and may not be patented under Section 101. *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013) (citation omitted). As the Supreme Court explained, "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1293 (2012). Accordingly, they belong to the "storehouse of knowledge . . . free to all . . . and reserved exclusively to none." *Bilski v. Kappos*, 561 U.S. 593, 602 (2010) (citation omitted).

The Supreme Court has adopted a two-step approach for all questions of patent eligibility. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. __, 134 S. Ct. 2347 (2014). First, the Court asks whether the claims at issue are directed to one of the patent ineligible concepts, such as an abstract idea. In *Alice*, for example, the Supreme Court concluded that the patent was directed to the concept of intermediated settlement. *Id.* at 2352. The Court held this an abstract idea because it was a "fundamental economic practice long prevalent in our system of commerce." *Id.* at 2356 (citation omitted).

Second, if the claims are directed to a patent-ineligible concept, they must "contain other elements or a combination of elements, sometimes referred to as an

'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the" concept. *Mayo*, 132 S. Ct. at 1294 (citation omitted). If the additional features add nothing of significance, the claim is not eligible for patent protection. *Id.* at 1302. In *Alice*, the claims applied the idea using generic computer functions. They did not improve the functioning of the computer itself or some other technology. 134 S. Ct. at 2359-60.

Applying these principles, this Court has repeatedly invalidated patents that claim abstract concepts applied on generic computers or over the Internet. *See, e.g., OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-64 (Fed. Cir. 2015), *petition for cert. filed* (U.S. Nov. 12, 2015) (No. 15-642) (offer-based price optimization); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (transaction performance guaranty); *Ultramercial II*, 772 F.3d at 715 (showing an advertisement before delivering content); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119 (2015) (collecting, recognizing, and storing data); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (processing information through a clearinghouse); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) (detecting credit card fraud based on information relating past transactions to a particular internet address).

Here, the district court twice deferred ruling on Zillow's motion for summary judgment of invalidity under Section 101, denying it orally on the record at the conclusion of trial.[34]  A11346 at 4376:3-6.  No written order explains the district court's reasoning.  In its opposition to the motion for summary judgment, LendingTree charted its patents to show how the claims directly correspond to the *Ultramercial* patent invalidated by this Court.  A3206-207; A3209-A3212.  The LendingTree patents are drawn to the abstract idea of comparing credit applications to lending criteria, and the claims merely apply that process using networked computers.  The Court should reverse the district court and remand with instructions to enter judgment of invalidity under Section 101.

## A.    The LendingTree Patents Embody an Abstract Idea.

The LendingTree patents claim an abstract idea for two reasons.  First, they claim a longstanding, fundamental economic practice much like other concepts found to be unpatentable abstract ideas.[35]  Second, they claim a process that can be

---

[34] This Court reviews *de novo* the denial of a motion for summary judgment for lack of subject matter eligibility under Section 101.  *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (2015) (citing *Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006)); *Ultramercial II*, 772 F.3d at 713.

[35] During claim construction, moreover, LendingTree declined to read the claims in light of the specification and advocated for the broadest possible interpretation. For example, it argued they cover comparison of *any* data reflecting creditworthiness, no matter how minimal, to select a lender.  A1236-37; A12890-891 at 138:10-139:2; A10028 at 114:11-16.  It also argued that the claims did not require competing offers from lenders.  A1250-251.

performed manually using no more than pen and paper. The LendingTree patents therefore have no meaningful difference from those previously invalidated by the Court. *See buySAFE*, 765 F.3d 1350, *Ultramercial*, 772 F.3d 709; *OIP*, 788 F.3d 1359; *Dealertrack*, 674 F.3d 1315.

### 1. The Asserted Claims Recite the Abstract Idea of Comparing Credit Applications to Lending Criteria.

The LendingTree patents recite the abstract idea of comparing credit information to lending criteria. The objective of the patents is to coordinate offers for loans. They accomplish this by gathering lending criteria from lenders, gathering data from borrowers about their creditworthiness, transmitting that data to the lenders, and transmitting offers to borrowers. A514-A517; A533-A534. Borrowers compare the resulting offers and may accept them. In other words, the claims recite a middleman whose job it is to coordinate offers of credit and facilitate borrowers' selection of lenders.[36] *See, e.g., Ultramercial II*, 772 F.3d at 715-16.

This concept, a credit application clearinghouse, is a "fundamental economic practice long prevalent in our system of commerce." *Alice*, 134 S. Ct. 2356 (quoting *Bilski*, 561 U.S. at 611). Mortgage brokers have always coordinated loan ap-

---

[36] The '816 patent recites only a subset of the claim elements of the '594. However, all of the claims are drawn to the same concept of a credit application clearinghouse, applied on computers and the Internet. They rise and fall together. *See Content Extraction*, 776 F.3d at 1348 (invalidating hundreds of claims as "linked to the same abstract idea").

plications between borrowers and lenders, including counseling borrowers regarding the lenders to which they should apply and their lending criteria, and communicating offers back to borrowers. A2714-716 at ¶¶ 18-24. These practices have existed as long as there have been multiple lenders. *See Content Extraction*, 776 F.3d at 1347 (claim directed to abstract idea where "humans have always performed these functions").

Indeed, both the Supreme Court and the Federal Circuit have held similar middleman or clearinghouse concepts abstract. *Alice*, 134 S. Ct. at 2356; *buySAFE*, 765 F.3d at 1355; *Dealertrack*, 674 F.3d at 1333. In *Dealertrack*, for example, this Court found invalid a claim that recited a strikingly similar series of steps, including receiving credit application data, selectively forwarding the credit application data, and forwarding a reply funding decision. *Id.* at 1331, 1334. The Court found these steps covered the abstract idea of processing information through a clearinghouse. *Id*. No meaningful difference distinguishes the concept covered by LendingTree's patents.

### 2. The Asserted Claims Recite a Process that Credit Brokers Have Long Performed Manually.

Under this Court's precedents, a patent covers an abstract idea if it claims a mental process or steps which can be performed manually using pen and paper. *CyberSource*, 654 F.3d at 1371-73 (claim invalid where its "steps can be performed in the human mind, or by a human using a pen and paper"); *Planet Bingo,*

*LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) ("not only can these steps be carried out in existing computers long in use, but they also can be done mentally") (citation and internal quotations omitted); *see also Mayo*, 132 S. Ct. at 1293 ("mental processes . . . are not patentable" (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972))).

The LendingTree patents computerize a practice that mortgage brokers and others perform manually without the use of computers or the Internet. A2974-976 at 71:4-73:1. LendingTree's experts conceded as much in the summary judgment record: a broker can practice the claims without using a computer, and brokers historically have done so. A2855-62 at 263:2-4, 256:12-17 (Step 1), 256:19-21 (Step 2), 258:25-259:9 (Step 3), 259:10-13 (Step 4), 259:15-18 (Step 5), 259:20-260:6 (Step 6), 260:7-261:12 (Step 7), 262:6-11 (Step 8), 262:13-20 (Step 9), 262:21-24 (Step 10). The inventor himself performed the filtering and selecting steps of the claims at his deposition using pen and paper. A2982-984 at 220:14-22, 221:18-222:9; A2991-993 at 229:18-231:17. The patents therefore claim an abstract idea, and absent some additional "inventive concept" are invalid.

### B. The LendingTree Patents Merely Computerize the Idea of a Credit Application Clearinghouse.

None of the limitations added to the clearinghouse concept make the inventions patentable, as they recite known brokering concepts or routine computer use. Well-understood, routine, conventional activities previously known to the industry

71

do not supply an inventive concept. *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1294). Similarly, the recitation of a generic computer or the Internet cannot transform an ineligible abstract idea into a patent-eligible invention. *Id*. at 2358 (citing *Mayo*, 132 S. Ct. at 1294); *buySAFE*, 765 F.3d at 1355; *Ultramercial II*, 772 F.3d at 716.

The patents recite only well-known and conventional limitations. The parties' experts agreed that the loan brokering limitations were known, rudimentary, and inherent aspects of operating a credit application clearinghouse. A2714-717 at ¶¶ 18, 25(A), 25(J); A2855-858 at 256:12-259:9. And LendingTree does not purport to have invented the computer system components and functions of the invention, which were also already well-known at the time of the invention. A2903-904 at 184:19-185:25.

Some claims suggest generic computing equipment and networks automate the credit broker process. A514, Cl. 1; A530 at 1:49, 56-57. The claims recite an "Internet user," the "Internet," a "website," and a "database" with no specificity regarding what these are or how they must be employed to practice the claims. *See* A514, Cl. 1. The specification describes use of a "web browser such as Netscape or Internet Explorer," an Intel Pentium computer with "standard components" such as the Windows NT operating system, an Ethernet connection, and a database. A531 at 3:46-62.

"Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent eligibility." *Intellectual Ventures*, 792 F.3d at 1371 (citation omitted); *see also OIP*, 788 F.3d at 1363. LendingTree's patent claims offer no detail regarding how the generic computing and networking components are configured in its system to achieve the desired result. *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) ("[C]laim 1 contains no restriction on how the result is accomplished."); *Dealertrack*, 674 F.3d at 1333 ("The claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method."). Accordingly, they cannot confer patentability.

Finally, the Court need not consider every claim before concluding the patent claims ineligible subject matter. *See Content Extraction*, 776 F.3d at 1348. Regardless, the asserted dependent claims also fail to offer any meaningful limitation, and instead also recite generic computing equipment or conventional aspects of loan brokering:

- **Displaying loan documents to a borrower or to a lender, and verifying the data in the documents.** '594 patent, claims 2, 3 and 14; *see* A2714-717 at ¶¶ 18, 25(a), and 25(j); A2855-858 at 256:12-17; 257:14-259:9;

73

- **Using each lender's requirements to form selection criteria that are used to choose loan applications.** '594 patent claim 5-7 and '816 patent claim 4-5; A2715-720 at ¶¶ 20, 23, 25(D), 25(K); A2973-976 at 70:25-73:1; A3023-024 at 74:21-75:19; A2858-859 at 259:20-260:6;

- **Determining an appropriate method to transfer credit data and doing so.** '594 patent claims 8-10 and '816 patent claims 2, 9, 11, 23; A2716-718 at ¶¶ 24, 25(E), 25(F); A2859-860 at 260:7-261:12; A3016[37];

- **Receiving a notification of successful transmission or of closure of a loan.** '594 patent claims 11 and 13;

- **Displaying positive credit decisions to the borrower, and receiving a decision from the borrower regarding offers of credit.** '816 patent claims 3, 8, 19, 20, and 24.[38]

---

[37] July 6, 1999 Office Action, noting that "it is old and well known in the credit processing art to send and transmit the credit qualification form to the lending institution by way of a Common Gateway Interface, a secured website or a secured E-Mail."

[38] The dependent claims also include a field of use limitation that the offered services relate to mortgages, loans, or credit cards (A533-534, claims 6, 21), and a step that requires recording the user's decision in a storage device. '594 patent claim 12. Neither of these adds an inventive concept. *See Bilski*, 561 U.S. at 612 (field of use); *Alice*, 134 S. Ct. at 2360 (data storage unit).

In short, none of the claim limitations direct LendingTree's patents to eligible subject matter, and the Court should therefore invalidate them.

### C.    LendingTree Conceded its Patents Track the Claims of the *Ultramercial* Patent.

In the district court, LendingTree argued its patent claims were analogous to the claims in *Ultramercial*.  A3206-14.  It argued they matched those claims by reciting the same number of steps at a similar level of detail, and that "the inherent complexity of employing computers on the Internet" conferred patentability on them.  This Court subsequently determined the *Ultramercial II* claims recited an unpatentable abstraction.  772 F.3d at 715.  "It is well established that a party who successfully argues one position is estopped from later adopting a contrary position in a case involving the same patent."  *Organic Seed Grower & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1358 (Fed. Cir. 2013), *cert. denied*, 134 S. Ct. 901 (2014).  LendingTree has in effect conceded that its claims are directed to an unpatentable abstract idea.[39]  It may not withdraw its admissions now that the Court has invalidated the *Ultramercial* patent.

---

[39] Indeed, LendingTree's claims arguably claim a more general abstraction.  Although invalid, the *Ultramercial* patent at least purported to address a problem specific to the Internet.  *Cf. DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014).  The concept of competing loan offers recited in LendingTree's patents, by contrast, predates computers and does not "effect an improvement in any other technology or technical field."  *Alice*, 134 S. Ct. at 2359.

## CONCLUSION

This Court should affirm the jury verdict of non-infringement and invalidity for failure to name the correct inventors, and decline to order additional correction proceedings at the district court.  It should reverse the district court's denial of summary judgment for invalidity under Section 101.

Dated:  November 25, 2015              Respectfully submitted,

                                       */s/ J. David Hadden*
                                       J. David Hadden
                                       Saina S. Shamilov
                                       Todd R. Gregorian
                                       Ravi Ranganath
                                       FENWICK & WEST LLP
                                       801 California Street
                                       Mountain View, CA  94041
                                       Telephone:(650) 988-8500

                                       *Attorneys for Defendant-Cross-Appellant
                                       Zillow, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing **PRINCIPAL AND RESPONSE BRIEF OF DEFENDANT-CROSS APPELLANT ZILLOW, INC.** to be filed with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system this 25th day of November, 2015, and that a copy was served on counsel of record by the CM/ECF system and by electronic mail to the parties on the service list below.

| | |
|---|---|
| Stephen S. Korniczky, Esq.<br>Martin R. Bader, Esq.<br>William J. Blonigan, Esq.<br>Michael Murphy, Esq.<br>Sheppard, Mullin, Richter & Hampton LLP<br>12275 El Camino Real, Suite 200<br>San Diego, California 92130<br>Email:skorniczky@sheppardmullin.com<br>    mbader@sheppardmullin.com<br>    wblonigan@sheppardmullin.com<br><br>Corby C. Anderson, Esq.<br>Nexsen Pruet, LLC<br>227 West Trade Street, Suite 1550<br>Charlotte, North Carolina  28202<br>Email:canderson@nexsenpruet.com<br><br>*Counsel for Plaintiff-Appellant LendingTree LLC* | Thomas J. Friel, Esq.<br>Matthew J. Brigham, Esq.<br>Cooley LLP<br>Five Palo Alto Sq, 3000 El Camino Real<br>Palo Alto, 94306<br>Email: tfriel@cooley.com<br>    mbrigham@cooley.com<br><br>Christopher C. Campbell, Esq.<br>Kevin A. Lake, Esq.<br>Cooley LLP<br>One Freedom Sq., Reston Town Center<br>11951 Freedom Drive<br>Reston, CA  20190-5656<br>Email: ccampbell@cooley.com<br>    klake@cooley.com<br><br>Mark P. Henriques. Esq.<br>Womble Carlyle Sandridge & Rice LLP<br>One Wells Fargo Center, Suite 3500<br>301 South College Street<br>Charlotte, NC  28202-6037<br>Email:  mhenriques@wcsr.com<br>*Counsel for Cross-Appellant NexTag, Inc.* |

Dated:  November 25, 2015          */s/ J. David Hadden*
                                    J. David Hadden

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b).  This brief contains 16,474 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(b)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief uses a proportionally spaced typeface using Microsoft Word and 14 point Times New Roman font.

Dated:  November 25, 2015   Respectfully submitted,

           */s/ J. David Hadden*
           J. David Hadden
           Saina S. Shamilov
           Todd R. Gregorian
           Ravi Ranganath
           FENWICK & WEST LLP
           801 California Street
           Mountain View, CA  94041
           Telephone: (650) 988-8500

           *Attorneys for Defendant-Cross-Appellant*
           *Zillow, Inc.*