# 𝔘nited 𝔖tates 𝔠ourt of 𝔄ppeals
# for the 𝔉ederal 𝔠ircuit

———————

**LENDINGTREE, LLC,**

*Plaintiff–Appellant,*

v.

**ZILLOW, INC.,**

*Defendant–Cross-Appellant*

**NEXTAG, INC. ADCHEMY, INC.,**

*Defendants*

————————————————

2014-1435, -1531, 2015-1186

————————————————

Appeals from the United States District Court for the
Western District of North Carolina in No. 3:10-cv-00439-FDW-DCK,
Chief Judge Frank D. Whitney

————————————————

**APPELLANT LENDINGTREE, LLC'S OPENING BRIEF**

————————————————

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

| | |
|---|---|
| Stephen S. Korniczky | 12275 El Camino Real, Suite 200 |
| Martin R. Bader | San Diego, California 92130 |
| Michael Murphy | Telephone:  (858) 720-8900 |
| | |
| Edward V. Anderson | 379 Lytton Avenue |
| | Palo Alto, California 94301 |
| | Telephone: (650) 815-2600 |

*Attorneys for Plaintiff–Appellant,*
*LENDINGTREE, LLC*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4, Plaintiff – Appellant LendingTree, LLC certifies the following:

1.    The full name of every party or amicus represented by us is LendingTree, LLC.

2.    The name of the real party in interest represented by us is LendingTree, LLC.

3.    The parent corporation and publicly held corporation that owns 10% or more of the stock of the party represented by us is LendingTree, Inc.

4.    The names of all law firms and partners or associates that have appeared for the party represented by us in the lower tribunal, or are expected to appear for the party represented by us in this Court, are:

Sheppard Mullin Richter & Hampton LLP:  Stephen Korniczky, Edward Anderson, Martin Bader, David Randall, Laura Burson, Bruce Colbath, Darren Franklin, James Chadwick, James Geriak, Paul Garrity, Jonathan Marina, Lai Yip, Matthew Mueller, Michael Murphy, William Blonigan

Nexsen Pruet, PLLC:  Corby Anderson, Matthew DeAntonio

Orrick, Herrington & Sutcliffe LLP:  Nagendra Setty, George Kanabe

Covington & Burling LLP:  Thomas Garten, Edward Daniel Robinson, Robert Fram, Winslow Taub

McGuirewoods LLP:  Steven Baker

DATED:  September 14, 2015

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By     _/s/ Stephen S. Korniczky_
            Stephen S. Korniczky

Attorneys for
Plaintiff – Appellant LendingTree, LLC

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE ............................................................. 2

STATEMENT OF THE FACTS ............................................................8

SUMMARY OF THE ARGUMENT ...................................................12

ARGUMENT ...................................................................................12

I.     THE DISTRICT COURT ERRED IN CONSTRUING THE TERMS "CREDIT DATA", "POSITIVE CREDIT DECISIONS", "OFFERS" AND THE "WHEREBY" CLAUSES........................................................12

     A.     Standard of Review ............................................................12

     B.     Erroneous Constructions and Exemplary Claims ...............13

     C.     The District Court's Construction of "Credit Data" is Erroneous Because it is Contrary to the Specification, Excludes the Preferred Embodiment, and Imports Limitations that Were Removed During Prosecution ............................................16

     D.     The District Court's Erroneous Construction of "Credit Data" Was Highly Prejudicial to LendingTree ............................20

     E.     The District Court Erroneously Construed "Offer" and "Positive Credit Decision" ..................................................22

     F.     The District Court Improperly Imported The Term "Offers" Into the "Whereby" Clause ..............................................28

G.  The District Court's Erroneous Construction of "Offer" and "Positive Credit Decision" and its Importation of "Offer" into the "Whereby" Clause Was Highly Prejudicial to LendingTree ........32

II.  THE DISTRICT COURT COMMITTED EVIDENTIARY ERRORS THAT SERIOUSLY PREJUDICED LENDINGTREE...............................36

A.  Standard of Review ............................................................36

B.  LendingTree Was Improperly Denied Its Right to Examine Zillow's Key Expert Using the Patent Specification .........................37

C.  The District Court Should Have Barred Appellees' Use of Irrelevant Testimony from Unrelated Litigations ...............................41

III.  THE DISTRICT COURT IMPROPERLY REFUSED TO VACATE THE JURY'S FINDING OF INVALIDITY DUE TO IMPROPER INVENTORSHIP ...........................................................................48

A.  Standard of Review ............................................................50

B.  The District Court Committed Reversible Error in Refusing to Correct Inventorship Pursuant to 35 U.S.C. Section 256...................51

1.  Upon invocation of Section 256, it is required—not discretionary—for a district court to make its own determination of inventorship and issue an order correcting inventorship. ............................................................51

2.  That the jury did not identify the correct inventors in a special verdict does not relieve the district court of the requirement to determine inventorship under Section 256.......55

3.  Even if the district court were required to defer to the jury's identification of correct inventors, substantial evidence could only support incorrect inventorship due to the omission of Bennett. ...........................................................57

4.  The district court erred by failing to order the PTO to correct inventorship in this case...............................................60

CONCLUSION ...................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

*Activevideo Networks, Inc. v. Verizon Communications, Inc.*
694 F.3d 1312 (Fed. Cir. 2012) .......................................................... 36

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*
448 F.3d 1324 (Fed. Cir. 2006) .......................................................... 26

*ATD Corp. v. Lydall, Inc.*
159 F.3d 534 (Fed. Cir. 1998) ........................................................... 36

*Bd. of Educ. ex rel. Bd. of Trustees of Florida State Univ. v.*
*Am. Bioscience, Inc.*
333 F.3d 1330 (Fed. Cir. 2003) .................................................... 52, 53

*Bicon, Inc. v. Straumann Co.*
441 F.3d 945 (Fed. Cir. 2006) ........................................................... 27

*C.R. Bard, Inc. v. M3 Sys., Inc.*
157 F.3d 1340 (Fed. Cir. 1998) .................................................... 54, 55

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH*
224 F.3d 1308 (Fed. Cir. 2000) .......................................................... 26

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*
412 F.3d 1331 (Fed. Cir. 2005) .......................................................... 56

*Cybor Corp. v. FAS Techs.*
138 F.3d 1448 (Fed.Cir.1998) (en banc) ............................................ 12

*Eli Lilly & Co. v. Aradigm Corp.*
376 F.3d 1352 (Fed. Cir. 2004) .......................................................... 57

*Engel Indus., Inc. v. Lockformer Co.*
96 F.3d 1398 (Fed. Cir. 1996) ........................................................... 27

*Ethicon, Inc. v. U.S. Surgical Corp.*
135 F.3d 1456 (Fed. Cir. 1998) .................................................... 57, 58

*Ethicon, Inc. v. U.S. Surgical Corp.*
921 F. Supp. 901 (D. Conn. 1995) ..................................................... 56

*FenF, LLC, v. Smartthingz, Inc.*
2014-1490 (Fed. Cir. Feb. 6, 2015) ..................................................13

*Fenner Investments, Ltd. v. Cellco Partnership*
No. 2013-1640 (Fed. Cir. Feb. 12, 2015) ..........................................13

*Fina Tech., Inc. v. Ewen*
265 F.3d 1325 (Fed. Cir. 2001) ..................................................50, 52

*Gaus v. Conair Corp.*
363 F.3d 1284 (Fed. Cir. 2004) ......................................................27

*IMX, Inc. v. LendingTree, LLC*
469 F.Supp.2d 203 (2007) ...................................... 41, 42, 43, 44, 45, 46, 47, 48

*Iowa State Univ. Research Found., Inc. v. Sperry Rand Corp.*
444 F.2d 406 (4th Cir. 1971) ..........................................................55

*Lexington Luminance LLC v. Amazon.com Inc.*
No. 2014-1384 (Fed. Cir. Feb. 9, 2015)............................................13

*Liebel-Flarsheim Co. v. Medrad, Inc.*
358 F.3d 898 (Fed. Cir. 2004) ........................................................30

*Marine Polymer Techs., Inc. v. HemCon, Inc.*
672 F.3d 1350 (Fed. Cir. 2012) ......................................................39

*Marketel Int'l, Inc. v. Priceline.com*
138 F. Supp. 2d 1210 (N.D. Cal. 2001)............................................56

*MCV, Inc. v. King-Seeley Thermos Co.*
870 F.2d 1568 (Fed. Cir. 1989) ......................................................53

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*
75 F.3d 1545 (Fed. Cir. 1996) ........................................................17

*Pannu v. Iolab Corp.*
155 F.3d 1344 (Fed. Cir. 1998) ......................................52, 53, 56, 61

*In re Papst Licensing Digital Camera Patent Litig.*
No. 2014-1110 (Fed.Cir. Feb. 3, 2015) ............................................13

*Patlex Corp. v. Mossinghoff*
   758 F.2d 594 (Fed. Cir. 1985) ...........................................................55

*Perkin-Elmer Corp. v. Computervision Corp.*
   732 F.2d 888 (Fed. Cir. 1984) ...........................................................57

*Phillips v. AWH Corp.*
   415 F.3d 1303 (Fed.Cir. 2005) ........................................23, 24, 27, 30

*Primos Inc. v. Hunter's Specialties Inc.*
   451 F.3d 841 (Fed. Cir. 2006) ...........................................................16

*Source Search Technologies, LLC v. LendingTree LLC*
   588 F.3d 1063 (Fed. Cir. 2009) .............................................41, 42, 46

*SRI Int'l v. Matsushita Elec. Corp. of Am.*
   775 F.2d 1107 (Fed. Cir. 1985) .........................................................29

*Stark v. Advanced Magnetics, Inc.*
   119 F.3d 1551 (Fed. Cir. 1997) .........................................................50

*Stevens v. Broad Reach Companies, L.L.C.*
   No. 05-647-CV-W-GAF, 2006 WL 1556313 (W.D. Mo. May 31, 2006) .........53

*Superguide Corp. v. DirecTV Enterprises, Inc.*
   358 F.3d 870 (Fed. Cir. 2004) ...........................................................29

*Tessera, Inc. v. ITC*
   646 F.3d 1357 (Fed. Cir. 2011) ...................................................39, 40

*TevaPharmaceuticals, USA, Inc. v. Sandoz, Inc.*
   ___ US ___ (2015), slip 11-13 .........................................................13

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n*
   805 F.2d 1558 (Fed. Cir.1986) .........................................................39

*United States v. Telectronics, Inc.*
   857 F.2d 778 (Fed. Cir.1998) ..................................................20, 21, 23

*Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*
   196 F.3d 1366 (Fed. Cir. 1999) .........................................................54

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*
   602 F.3d 1235 (Fed. Cir. 2010) .........................................................36

*Verizon Servs. Corp. v. Vonage Holdings Corp.*
   503 F.3d 1295 (Fed. Cir. 2007) .........................................................17

*Vitronics Corp. v. Conceptronic, Inc.*
   90 F.3d 1576 (Fed. Cir. 1996) ....................................................17, 39

*Westberry v. Gislaved Gummi AB*
   178 F.3d 257 (4th Cir. 1999) .............................................................37

*Yeda Research and Dev. Co. v. Imclone Sys. Inc.*
   443 F. Supp. 2d 570 (S.D.N.Y. 2006) ..............................................54

<u>Federal: Statutes, Rules, Regulations, Constitutional Provisions</u>

37 C.F.R. 1.324(a) .................................................................................60

28 U.S.C. § 1295(a)(1) .............................................................................1

35 U.S.C. § 116 ....................................................................................53

35 U.S.C. § 256 ..............................................................6, 49, 51, 56, 61

Fed. Cir. Rule 4(a) ..................................................................................1

Fed. R. Civ. P. 50(a) ...........................................................................5, 6

Fed. R. Civ. P. 50(b) ...............................................................................7

Fed. R. Civ. P. 59 ....................................................................................7

Fed. R. Civ. P. 59(a) ................................................................................7

## STATEMENT OF RELATED CASES

This case was not previously before the Court of Appeals for the Federal Circuit or any other appellate court under the same or similar title.  Appellant LendingTree, LLC ("LendingTree") is not aware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).  This is a timely appeal of three decisions under Federal Circuit Rule 4(a):  (1) a final judgment of noninfringement and invalidity for incorrect inventorship in favor of Appellees Zillow, Inc. ("Zillow") after a jury trial on U.S. Patent Nos. 6,385,594 and 6,611,816, (2) an order denying LendingTree's request to correct inventorship, and (3) an order denying post-trial motions to amend the final judgment and for a new trial.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in its claim construction of the terms "credit data", "offers", "positive credit decisions" and the "whereby" clauses.

2.    Whether the district court erred in refusing to grant LendingTree's motion for a new trial after:

      a.    prohibiting LendingTree from cross-examining Zillow's key non-infringement expert using the patent specifications; and/or

      b.    failing to exclude irrelevant testimony from prior unrelated patent litigation regarding the scope of unrelated third-party patent claims.

3.    Whether the district court erred in refusing to correct inventorship of LendingTree's asserted patents.

## STATEMENT OF THE CASE

LendingTree's '594 and '816 Patents issued in May 2002 and August 2003, respectively.  A500, 518.  The patents claim specific methods and systems for generating leads related to potential loans.  *See* A514-17, 533-34.  For example, claim 1 of the '816 Patent collects preliminary information from a borrower regarding the borrower's potential creditworthiness.  A533.  Lending institutions may then compete with each other to provide loan terms for which the borrower may qualify based upon this preliminary information.  A533.  Certain dependent

claims include additional elements such as displaying one or more positive credit decisions.  A533-34 (claims 8 and 22).

The claims do not require that the preliminary information gathered from the borrower and transmitted to the lender include any specific information.  For example, the patent specifications provide a detailed ten-stage preferred embodiment where the lenders compete with each other based on non-specific preliminary information.  Importantly, personally-identifiable information such as "the borrowers name, social security number, application id number [and other contact information]" is not provided to the lender until late in the process  "in the *acceptance* email sent when the offer was accepted" by the borrower (in stage 9). A532-33 (emphasis added). Thus, in this preferred embodiment, detailed personal information is not provided to the lender until after the lender has provided an "offer" of potential loan terms, and the borrower has sent an "acceptance email." Other claims, include a further step of providing the borrower with a "positive credit decision" regarding the potential loan terms.  A533-34.

LendingTree filed suit against Appellee Zillow on September 8, 2010 asserting that Zillow infringed the '594 and '816 Patents.  A1000-09.  On April 12,

2012 and October 4, 2012, the district court issued orders construing the claims at issue in this appeal.  A1-2; A6-13.[1]

The parties proceeded to trial on February 10, 2014.  A10200-01.  During trial, LendingTree presented evidence that Zillow infringed LendingTree's patents under the district court's claim constructions.  In response, Zillow's primary non-infringement argument was that under the district court's claim construction, LendingTree's patents *required* the collection of at least a borrower's name, Social Security number, and birth date, and *required* that the claimed process/system result in an offer to close a loan.  A10592, 10760-61, 10762.  LendingTree sought to cross-examine Zillow's foundational non-infringement expert with the patents' specification to show that Zillow's non-infringement theory was contrary to the preferred embodiment.  However, the district court prohibited LendingTree from challenging the expert with the patent specification.  A10768-70.  LendingTree then moved for a mistrial, which the district court immediately denied.  A10771.

In addition to advancing a non-infringement argument that excluded the preferred the embodiment, Zillow also repeatedly introduced testimony from two unrelated litigations where an earlier version of LendingTree's lead-generation service was found to infringe two unrelated patents.  Zillow seized on superficial

---

[1] LendingTree moved for reconsideration of the district court's order regarding "credit data", "offer" and "positive credit decisions" on August 31, 2012 (A2266-68), but the motion was denied.

similarities between these unrelated patents and LendingTree's patents to suggest that because LendingTree had argued (unsuccessfully) that LendingTree's lead-generation service did not infringe those unrelated patents, then Zillow's accused service could not infringe LendingTree's patents.  A1061-13, 10947-48, 12108, 12196, 12199-200, 12261.  LendingTree repeatedly objected to Zillow's use of testimony from this unrelated litigation, but the district court repeatedly over-ruled LendingTree's objections.  A10394-96, 10611, 10613.

Zillow was not content with merely introducing this testimony from unrelated litigation as purportedly showing that Zillow's service did not infringe LendingTree's patents.  When LendingTree witnesses testified that Zillow's products infringed LendingTree's patents, Zillow repeatedly implied that LendingTree's witnesses were lying because of positions LendingTree took in unrelated litigation.  *See, e.g.,* A10394-98.  Zillow spent more time on LendingTree's testimony from these unrelated cases than on almost any other issue in the case.  *See* A10392-398, 10610-13, 10945-948, 10952-53, 11243-45.  This was highly prejudicial to LendingTree and gave the jury the impression that LendingTree's unsuccessful non-infringement positions in those cases somehow showed that Zillow did not infringe LendingTree's patents.

On March 6, 2014, after 13 days of trial, LendingTree filed its Rule 50(a) motion on the ground, *inter alia*, that it had introduced sufficient evidence to

demonstrate that Zillow infringed the asserted patents under the district court's constructions, and that Zillow and its co-defendants had failed to establish that LendingTree's patents were invalid. A7124-26. On March 7, 2014, the district court orally denied LendingTree's Rule 50(a) motion. A11083.

The jury entered its verdict, finding that Zillow did not infringe any of the asserted claims and that the '594 and '816 Patents were invalid for failing to identify the correct inventors. A7226-29. The jury further found that LendingTree had not engaged in inequitable conduct in procuring its patents, and that LendingTree's assertion of the patents against Zillow did not constitute an anti-trust violation. A7230-31. That same day, LendingTree orally requested that the district court hold a hearing to correct inventorship pursuant to 35 U.S.C. §256 ("Section 256"). A11336-37. The district court then requested briefing on the proper procedure for correcting inventorship. A11337.

On March 20, 2014, LendingTree again requested (via written brief) that the district court issue an order, prior to entering final judgment, requiring the PTO to issue a certificate adding LendingTree ex-employee, Jamie Bennett, as a named inventor on the '594 and '816 Patents. A7232-33. The district court refused to hold a hearing, and on March 31, 2014 entered Judgment in the case in accordance with the jury verdict. A18. On April 22, 2014, LendingTree timely filed its notice of appeal from the March 31, 2014 Judgment. A19.

LendingTree also timely filed a motion under Rule 59(a) requesting a new trial on the issues of infringement and damages, and under Rule 50(b) requesting correction of inventorship under Section 256, and, in the alternative, for a new trial under Rule 59 that the '816 and '594 Patents are not invalid for failing to identify correct inventors.  A7933-34.  At the same time, LendingTree filed its motion requesting a new trial on the issues of infringement, willful infringement and damages.  A8116.  The district court denied both of LendingTree's motions in their entirety.   A30-31, 38.

LendingTree timely filed an amended notice of appeal.  A59.  In this appeal, LendingTree respectfully requests that this Court reverse the district court's construction of the terms "credit data", "offer", "positive credit decisions" and the "whereby" clauses, and remand the case for new trial under the correct claim construction.  Review of the terms "credit data" and "offer" will largely resolve all of the claim construction issues because the district court construed "offer" and "positive credit decision" identically, and because the district court improperly imported the term "offer" into the "whereby" clauses where the term does not occur.

LendingTree further requests that this Court remand this case for trial with instructions to the district court to (1) prohibit Zillow from introducing evidence from prior litigations involving alleged infringement of unrelated patents by

different services, and (2) permit LendingTree to cross-examine Zillow's experts about the specification of LendingTree's asserted patents.

Finally, LendingTree requests that this Court reverse the district court's ruling of invalidity, and issue an order instructing the PTO to correct the inventorship of LendingTree's patents by adding Bennett to the patents. Alternatively, this Court should order the district court to hold a hearing under Section 256 to determine the correct inventors for the '594 and '816 Patents.

## STATEMENT OF THE FACTS

In the late 1990's, LendingTree's founder, Doug Lebda, revolutionized the mortgage industry when he, Richard Stiegler and James Bennett[2] invented and commercialized a lead-generation service where a person interested in obtaining a mortgage can be seamlessly connected to multiple potential lending institutions looking for borrowers who match that person's borrower profile.  A500, 518. Using the patented system, multiple lending institutions could simultaneously compete for a borrower's business, based on preliminary information specific to

---

[2] For the purposes of this appeal, LendingTree does not dispute the jury's conclusion that Bennett is an inventor, but instead asks this Court to correct inventorship of the patents-in-suit under 35 U.S.C. ¶256.  As described in Section III.B.3 *infra* the evidence presented to the jury regarding inventorship cannot support any defects in inventorship other than a failure to name Bennett as an inventor.  Moreover, there is no evidence from which the jury or the district court could find that the failure to list Bennett as an inventor was the result of deceptive intent by Bennett – the test for correction of the patents under 35 U.S.C. ¶256.

the borrower.  A10759.  This invention forced lending institutions to compete on a

simultaneous basis, and led to vastly increased lead-generations and allowed

borrowers to select among a broader array of competing lenders.  A10792.

Prior to the patented system, shopping for a mortgage was always a daunting

task where would-be borrowers suffered a substantial competitive disadvantage

compared to lending institutions. A10778.  At the time the '594 and '816 Patent

inventions were conceived, there was no defined forum in which prospective

borrowers could find out whether they were receiving a competitive loan offer.

A10778-79.  Filling out separate forms and interacting with multiple lending

institutions was burdensome and did not give potential borrowers any assurance

that a lender had any significant interest in extending a loan to them.  A511, 10759.

Prior to the patented invention, lending institutions would receive

information from prospective borrowers via a Form 1003 loan application and

through the underwriting process.  A10760.  This typically required borrowers to

"apply for individual loans at individual banks.  And it was very cumbersome, very

time consuming."  A10270, 10759.  During that time, loan rates frequently

changed and borrowers could never be certain that they were receiving

comparable, competitive offers from lenders.  A10779.  By the same token,

lending institutions would receive a potential borrower's full application and take

the time to process the information without knowing in advance how likely they

were to extend or deny credit to that borrower, nor knowing whether a borrower would likely even accept a given proposal to extend credit.  A10779.  Thus, lending institutions would need to take the time to discern which applicants were qualified to receive a loan and the rate at which the lending institution would offer the loan.  A10779.  Because of the substantial effort it took borrowers and lenders to process these individual applications, borrowers and lenders alike lacked the time and ability to stage a competitive, efficient marketplace for loan offers.  A10784, 10789.

The patented inventions revolutionized the way banks and other lenders match mortgage leads with potential mortgages to, ultimately, originate loans.  A10377, 12022, 12042, 12043-44.  The inventions provided a better system for lenders to receive applications from qualified potential borrowers and for borrowers to secure competitive loan offers.  A10779, 10785-86.  Using the patented system, multiple lending institutions could simultaneously compete for a borrower's business, based on preliminary information specific to the borrower.  A10759.  This preliminary information was sufficient for a lending institution to provide the loan terms for which the borrower may qualify, but was not necessarily a full loan application.  A10785.  Nor was this preliminary information necessarily the comprehensive information necessary to eventually fund a loan.  *Id.*

The patented invention coordinates business between a potential borrower and multiple lenders, identifying, transforming, and sharing information based on specific business, credit, and technological parameters of the borrowers and lenders. A511-13 ('594 Patent, Abstract; 1:34–44; 2:8–17; 5:17–26). The patented inventions also allow loans to be offered across a broader geographic and demographic base than was previously available. A10779. Prior to the patented inventions, any attempt by a lender to seek or attract a large number of potential borrowers for competitive loans would have resulted in the lender losing the opportunity to close those loans because of the time needed to weed out applicants that did not meet the lender's internal criteria. A10779, 10784, 10789-90. Thus, outside of the specific processes set forth in the patent claims, it was impossible as a practical matter for a potential borrower to apply for a loan from a broad swath of lending institutions and receive competitive offers because of the extensive time required to complete burdensome applications for each lender. A10784.

Thus, the patented inventions benefitted not only the borrower, but also the lending institutions by providing a distilled pool of borrowers meeting a minimum combination of credit-related criteria. A10779. Lending institutions gained access to a new form of direct competition with other lending institutions that depended on quickly identifying the most promising potential borrowers and agreeing to do business on specific terms early on in the iterative lending process. A511 ('594

Patent, Abstract; 1:58–2:17).  The new competitive platform benefitted borrowers and creditors alike, by opening the online playing field to smaller lenders that were otherwise unable to take advantage of the old, high-cost Loan Origination software and thereby broadening the real-time competition for a prospective borrower's business.  A10779, 10792.  In recognition of this, LendingTree received multiple industry awards, and its business boomed.  A10377, 12022, 12042, 12043-44.

## SUMMARY OF THE ARGUMENT

The district court committed four critical errors that LendingTree appeals: (1) it incorrectly construed the claims of LendingTree's asserted patents; (2) it barred LendingTree from cross-examining Zillow's expert, Marshall Dennis, with the asserted patents; (3) it permitted extensive introduction of irrelevant and prejudicial testimony regarding non-asserted patents from unrelated litigation; and (4) it refused requests to correct inventorship of LendingTree's patents.

## ARGUMENT

I.  **THE DISTRICT COURT ERRED IN CONSTRUING THE TERMS "CREDIT DATA", "POSITIVE CREDIT DECISIONS", "OFFERS" AND THE "WHEREBY" CLAUSES**

### A.  Standard of Review

"Claim construction is a question of law reviewed de novo." *Cybor Corp. v. FAS Techs.,* 138 F.3d 1448, 1454–55 (Fed.Cir.1998) (en banc).  The Supreme Court recently modified the standard of review for factual findings regarding

extrinsic evidence made by the district court in a claim construction order.

*TevaPharmaceuticals, USA, Inc. v. Sandoz, Inc.*, ___ US ___ (2015), slip 11-13.

However, here, the district court cited no extrinsic evidence and made no factual

findings in rendering the disputed constructions. *See* A1-2, A6-13.  Thus, the

Court should review the district court's constructions without deference. *See, e.g.,*

*In re Papst Licensing Digital Camera Patent Litig.,* No. 2014-1110 (Fed.Cir. Feb.

3, 2015)*; Fenner Investments, Ltd. v. Cellco Partnership,* No. 2013-1640 (Fed. Cir.

Feb. 12, 2015)*; Lexington Luminance LLC v. Amazon.com Inc., No.* 2014-1384

(Fed. Cir. Feb. 9, 2015); *FenF, LLC, v. Smartthingz, Inc.,* 2014-1490 (Fed. Cir.

Feb. 6, 2015).

### B.    Erroneous Constructions and Exemplary Claims

The district court erroneously construed four terms – "credit data", "positive

credit decisions", "offer" and the "whereby" clause – that are found in the asserted

claims.  Claim 1 from the '594 Patent and Claim 22 from the '816 Patent are

exemplary claims.  Claim 1 from the '594 Patent reads:

A method for coordinating an electronic credit qualification form
between an Internet user and a plurality of lending institutions via the
Internet, comprising the steps of:

a) receiving selection criteria from the plurality of lending institutions;

b) storing the selection criteria in a database;

c) displaying a plurality of documents in a web site;

d) receiving a plurality of **credit data** sent from the Internet user;

e) applying said **credit data** to a filter comprising the plurality of selection criteria of the database to select without manual intervention each one of said plurality of lending institutions associated with a match of said **credit data** to said selection criteria;

f) determining an appropriate transfer method to transmit said electronic credit qualification form to the lending institutions associated with a match of said **credit data**;

g) transmitting said electronic qualification form comprising said **credit data** to said plurality of lending institutions associated with a match of said **credit data** via said appropriate transfer method, the transmission of said electronic qualification form comprising said **credit data** occurring without a delay for reception of any credit decisions from said lending institutions;

h) receiving a plurality of **positive credit decisions** from said plurality of lending institutions associated with a match of said **credit data** regarding an **offer** of credit or a loan to the Internet user;

i) simultaneously displaying the plurality of **positive credit decisions** to the Internet user on the web site;

j) receiving via the web site at least one decision from the Internet user regarding at least one of the **positive credit decisions**, the Internet user's decision comprising an acceptance, denial or request for more information regarding a **positive decision** for one of said lending institutions associated with a match of said **credit data**; and

k) transmitting the at least one Internet user's decision to at least one lending institution corresponding with a **positive credit decision** so that said Internet user can obtain credit or a loan from one of said lending institutions associated with a match of said **credit data**,

**whereby** said lending institutions associated with a match of said **credit data** compete with each other for business with the Internet user.

A514 (emphasis added).

Claim 22 from the '816 Patent reads:

-14-

A system for coordinating business between a computer user and a plurality of lending institutions comprising:

a processing unit;

a memory storage device; and

a program module, stored in said memory storage device for providing instructions to said processing unit;

said processing unit responsive to said instructions of said program module, operable for

receiving selection criteria from a plurality of lending institutions;

receiving **credit data** sent from the computer user;

employing the selection criteria to filter the **credit data** and to automatically select one or more lending institutions from the plurality of lending institutions; and

forwarding the **credit data** to the selected one or more lending institutions;

**whereby** the selected lending institutions compete with each other for business with the computer user.

A534 (emphasis added).

The district court erroneously construed "credit data" to mean "information entered on the qualification form sufficient for a lending institution to extend or deny credit." A2, 11152. The district court also erroneously construed the terms "offer" and "positive credit decision" to have the same meaning, *i.e.*, "a proposal to extend credit that can be accepted by the user to create mutual assent." *Id.* Within this construction, the district court went on to construe "mutual assent" to mean a "binding promise." A10728, 11152. Finally, the district court then improperly

imported the term "offer" into all the "whereby" clauses even though the term is only found in the "whereby" clause in claim 7 of the '816 Patent. A12; 533.

**C.    The District Court's Construction of "Credit Data" is Erroneous Because it is Contrary to the Specification, Excludes the Preferred Embodiment, and Imports Limitations that Were Removed During Prosecution**

LendingTree moved the district court to construe the term "credit data" to mean "data reflecting the potential creditworthiness of the user." A1235-38. The district court, however, rejected LendingTree's proposal and construed "credit data" to mean "information entered on the qualification form sufficient for a lending institution to extend or deny credit." A2, 11152. This construction improperly imports limitations into the claims and also excludes the preferred embodiment from coverage, because the preferred embodiment does not require that credit data be "sufficient information for a lender to extend or deny credit." The preferred embodiment merely collects preliminary credit related information from the borrower some of which is provided to matched lenders, provides the borrower with quotes from potential lenders, and then upon the borrower's acceptance of a quote ***collects additional information*** necessary to close the loan. A532-33 ('816 Patent at Col. 6-7).

This Court's case law explicitly warns against interpreting a claim term in a way that excludes the preferred embodiment from the scope of the invention. *See Primos Inc. v. Hunter's Specialties Inc.*, 451 F.3d 841, 848 (Fed. Cir.

2006); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996);

*see also Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed.

Cir. 1996). Moreover, this Court has cautioned against interpreting a claim term in

a way that excludes disclosed embodiments, when that term has multiple ordinary

meanings consistent with the intrinsic record. *See, e.g.*, *Verizon Servs. Corp. v.

Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (noting the disputed

claim term has multiple ordinary meanings and adopting the ordinary meaning that

includes the disclosed examples in the specification).

The process described in the preferred embodiment has 10 stages. In "stage

2," the computer user (borrower) submits a qualification form. *See* A501, 511-12

('594 Patent, Fig. 1; 2:2-17; 4:5-18). At least some of the information entered on

the qualification form constitutes "credit data." *See*, *e.g.*, A514 ('594 Patent Claim

1 ("qualification form comprising said credit data")). However, "credit data" does

not need to be all of the information provided on the "qualification form." Indeed,

in the preferred embodiment, the information entered on the qualification form also

does not need to be sufficient information for a lending institution to extend credit

by making or closing a loan. A10783-84. This is shown by stages 6-10 of the

preferred embodiment.

In stages 6-7, the received credit data is compared against each lender's

selection criteria and transmitted to some or all of the matching lenders. *See, e.g.*,

A512-13 ('594 Patent at 4:52-5:31 (describing a comparison); 5:35-42 (explaining that the "application" is what is sent to matching lenders)).  However, at this point, the selected lenders do not have sufficient information to formally extend or deny credit because, for example, information such as the name and social security number are not provided to the lender until later in the process when the potential borrower sends an acceptance email.

As part of stage 8, selected lenders can make an "offer" and request *additional* information from the borrower (*e.g.*, Social Security number), above and beyond the credit data transmitted to the lender. A508, 513 ('594 Patent at Fig. 10, 6:7-15 ("The text decision message file contains a loan id number and a request for more information from the borrower.")), A10785.  This collection of additional information occurs *after* the qualification form has been received and before closing of the loan. *See id.*; Fig. 10.

In stage  9, the borrower can reply to the "lender's application" by accepting or denying it.  A501, 512 ('594 Patent at Fig. 1, 3:20-22).  However, a "lender's application" is not a Form 1003[3] or even indicative of sufficient information to close a loan.  This is shown by the additional information gathered in stage 10.

---

[3] A Form 1003 is a standardized application used to apply for a home loan since the 1970s. *See* A10760.

In stage 10 of the preferred embodiment, the "lender contacts the borrower to coordinate the closing of the loan." A513.  At this stage, "the lending institution has the borrower's name, social security number, application id number, phone number … and the best time to contact the borrower from the email sent when the offer was accepted…" but must still collect *more* information before closing the loan – *i.e.,* extending or denying credit.  A513.  It is only "[o]nce all documents are signed and delivered from the borrower" that "the loan is closed."  A514.

Thus, the "credit data" collected on the qualification form need not be sufficient for a lending institution to extend or deny credit.  Rather, it is preliminary information regarding the potential creditworthiness of the potential borrower.  A10725.  From this information, the lender can determine whether or not it wishes to provide an "offer" and request additional information, or move forward with a "positive credit decision."  A10785-86.  The claimed "credit data" is used to generate leads, not to close mortgage loans.

Here, the district court erroneously construed "credit data" to require all the information necessary for a lender to extend or deny credit.  A2, 11152.  This overly narrow construction excludes the preferred embodiment from coverage by the patent claims.  That is, "credit data" cannot be sufficient information for a lender to extend or deny credit, because the preferred embodiment teaches that

-19-

lenders will request additional information (*e.g.*, Social Security number) *after* the initial collection of "credit data" on the qualification form.  A513.

Moreover, the requirement to extend credit was removed during prosecution. The original version of claim 1 from the '594 Patent included the words "to extend an offer of credit," but this language was purposefully removed during prosecution. A2239 (showing removal of language from claim 1, subparagraph (g)).  "[C]ourts are not permitted to read back into the claims limitations that were originally removed and were removed during prosecution."  *United States v. Telectronics, Inc.*, 857 F.2d 778, 783 (Fed. Cir.1998).  Thus, the district court's construction of "credit data" erroneously reads back into the claims a limitation to collect sufficient information to be able to extend credit – a limitation that was removed during prosecution.  In contrast, the construction advanced by LendingTree maintains the integrity of the specification and complies with the preferred embodiments and the prosecution history.  Accordingly, this Court should vacate the district court's construction of "credit data" and construe the term to mean "data reflecting the potential creditworthiness of the user."

### D.    The District Court's Erroneous Construction of "Credit Data" Was Highly Prejudicial to LendingTree

The district court's erroneous construction was highly prejudicial to LendingTree.  Zillow argued throughout the trial that it did not collect "credit data" because its service did not initially request a borrower's Social Security number or

other information (such as a name and birthdate) necessary to close a loan and collected on a Form 1003. A10592, A10760-61 ("[T]he application has to be completed, the 1003 [a standardized mortgage application], and all of the processing that occurs after that before a decision [to extend or deny credit] can be made."), A10762 (Arguing that before making a decision to extend or deny credit, lenders would need to get "the borrower's name, their Social Security number, date of birth and their present address."). Zillow repeatedly argued to the jury that under the district court's construction of "credit data" there could be no infringement if a qualification form did not collect a computer user's social security number or the information necessary to close a loan agreement. A10788, 10947, 10987. This key noninfringement argument for Zillow rested entirely upon the district court's erroneous construction of "credit data", and is contrary to the preferred embodiment of the patent. *See id.*

Again, the asserted claims do not limit the term "credit data" to specific information such as a borrower's name, Social Security number, or birthdate. "Credit data" is simply a subset of the information captured on the "qualification form"[4] that reflects the potential creditworthiness of the borrower. If the district court had properly construed "credit data," Zillow would not have been able to

---

[4] *See* A514 ('594 Patent Claim 1 ("qualification form comprising said credit data")).

make its improper non-infringement argument that "credit data" must include

specific items of information including the Social Security number of a potential

borrower.  Moreover, LendingTree presented evidence that Zillow's service

collected information reflecting a borrower's potential creditworthiness (*see, e.g.,*

A10600) and could have presented more evidence of infringement if the district

court had properly construed "credit data."

Accordingly, the Court should vacate the district court's construction of the

term "credit data," construe "credit data" to mean "data reflecting the potential

creditworthiness of the user," and remand this case for a new trial.

### E.    The District Court Erroneously Construed "Offer" and "Positive Credit Decision"

LendingTree moved the district court to construe "offer" to mean "loan

terms for which the user may qualify" and to construe "positive credit decision" as

its plain meaning.  A1238-41.  These constructions are consistent with the way the

terms are used in the specification, and follow the cannons of claim construction

promulgated by this Court.  The specification uses the term "offer" in the preferred

embodiment to refer to the lender providing initial loan terms for which the user

may (or may not) qualify.  This "offer" is not a binding commitment to close a

loan.  The specification describes the lender receiving an "acceptance email sent

when the offer was accepted," but also states that **<u>later</u>** the "lender contacts the

borrower to coordinate the closing of the loan" and indicates that this was

conditional on the collection of additional documents and information from the borrower. A513-14. Because the preferred embodiment teaches that the "offer" and acceptance occur before the lender has obtained the information and confirmations necessary to formally extend credit through the closing of the loan (*id.*), the "offer(s)" referred to in the claims refer to loan terms for which a computer user *may* qualify – pending further documentation and confirmation of previously submitted information.

Although the terms "offer" and "positive credit decision" are separate and distinct claim terms, the district court construed them identically to both mean "a proposal to extend credit that can be accepted by the user to create mutual assent." A2, 11152. Prior to trial, the district court stated that the words "mutual assent" in its construction meant a "contract." A10155. In the middle of trial, concerned that this wording "i.e., contract" imported legal terms of art into the patent, the district court re-stated its construction of "mutual assent" as a "binding promise," not a contract. A10728, 11152. Both constructions are incorrect because they are contrary to the preferred embodiment of the patents and do not reflect the meaning that the term "offer" or "positive credit decision" would have had to a person of ordinary skill in the art at the time of the invention. *See Phillips*, 415 F.3d at 1313. One of skill in the art would have understood "offer" to mean "loan terms for

which the user may qualify" and would have understood "positive credit decisions" according to its plain and ordinary meaning.

When the specification uses the term "offer" in the description of the preferred embodiment, it does not require or imply a final, binding "offer to extend credit" that can be accepted to create "mutual consent" or a "binding promise"  On the contrary, the specification provides that more information may be exchanged, either by the borrower requesting information, or by the lender requesting information after the "offer" is made, but prior to closing a loan as described in Stage 10 of the preferred embodiment.  A513 ("The text message decision file contains a loan id number and a request for more information from the borrower."), ("Once the lender logs into the website he can download information relating to a borrower's request for information.")).  The specification further describes the lender receiving an "acceptance email sent when the offer was accepted," but indicates that later "the lender contacts the borrower to coordinate the closing of the loan"—including the collection of additional documents and information from the borrower. A513.  Thus, the "offer," "positive credit decision," and "acceptance" occur even before the lender has obtained the information and confirmations needed to decide to formally close a loan (*i.e.* the detailed information collected in a formal loan application).

The district court's construction of "offer" and "positive credit decision" are inconsistent with the specification and the preferred embodiment. The district court took a legalistic view of what "offer," "positive credit decision," and "acceptance" may mean to a lawyer, incorporating the common law legal term "mutual assent," and then further construing that phrase for the jury – first to mean a "contract," and then changed it to mean a "binding promise." However, the specification does not require that either of these terms incorporate a contract or a binding promise. In mid-trial, the district court acknowledged that "contract" and "mutual assent" were phrases that it should not have included in its claim construction.

> THE COURT: I created this problem, and I was doing the very best I could to avoid this problem. What I was hoping to do was to stay away from legal terms of art. The word 'contract' amongst us lawyers is clearly a legal term of art.

A10728.

> THE COURT: I should've gone away from a term that has legally mutual assent, and used something that an average American understands.

A10728.

Not only was this overly confusing to the jury, it was fundamentally incorrect because it is contrary to the specification and the use of the term "offer" in the claims. Incorporating "contract" and/or "binding promise" did nothing to clarify the scope of "offer" and the district court's construction finds no support in

the specification. Accordingly, this Court should reverse the district court's construction of "offer" and "positive credit decision" and remand for a new trial on the issue of infringement.

In addition to construing "offer" and "positive credit decision" in a manner contrary to their usage in the claims and the description in the preferred embodiment, the district court also construed both terms to have an identical meaning. This too provides grounds for reversal. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings. . . ."); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."). Indeed, LendingTree specifically asked the Court to reconsider its construction of these terms on the grounds that "positive credit decision" is broader than "offer," and merely regards an "offer." A2278. This difference in claim scope is shown by claims that include both "offer" and "positive credit decisions." *See, e.g.,* A514-16 ('594 Patent, claim 1 (quoted *supra* in Section I. B.), claim 15 ("displaying a plurality of **credit decisions** on a web site from said identified lenders that received the credit data regarding an **offer** of credit or a loan to the borrower"), claim 21 ("receiving **positive credit decisions** from the identified lending institutions that received the

credit data regarding an **offer** of credit or a loan to the consumer") (emphasis added)).  These claims underscore that "positive credit decisions" must have a different meaning and scope from "offer," because they claim "positive credit decisions" that are "regarding an offer of credit or loan."

Under this Court's precedent all claim terms must be given meaning and none can be considered superfluous or redundant.  *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed.Cir. 2005)(en banc); *Digital-Vending Svcs. Intern. V. Univ. of Phoenix, Inc.*; 672 F.3d 1270, 1275 (Fed. Cir. 2012) (reversing district court claim construction that rendered "language in many of the asserted claims [ ] superfluous."); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)("[C]laims are interpreted with an eye toward giving effect to **all** terms in the claim.'') (emphasis added).  Thus, where a claim lists limitations separately, "the clear implication of the claim language" is that those elements are "distinct component[s]" of the claimed invention.  *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004); *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404-05 (Fed. Cir. 1996) (holding that claim limitations described as a "second portion" and a "return portion" "logically cannot be one and the same.").  Here, the district court's identical construction for these two different terms is unsupported by the patent and legal precedent, and therefore should be reversed.

LendingTree had moved the district court to construe "offers" to mean "loan terms for which the user may qualify" and to construe "positive credit decisions" according to its plain and ordinary meaning. A1238-41. These constructions are consistent with the use of the terms in the preferred embodiment (A513-14), and treat each claim term separately as required under the canons of claim construction promulgated by this Court. The district court's constructions of "offer" and "positive credit decisions" were legally erroneous and should be vacated, and the terms should be construed as requested by LendingTree.

### F.    The District Court Improperly Imported The Term "Offers" Into the "Whereby" Clause

LendingTree's asserted claims all end with a "whereby" clause. *See, e.g.,* A514, 533-34 ('594 Patent, Claim 1 – "whereby said lending institutions associated with a match of said credit data compete with each other for business with the Internet user", '816 Patent, Claims 1, 22 – "whereby the selected lending institutions compete with each other for business with the computer user."). The district court imported the term "offer" into its construction of all the "whereby" clauses in the claims, construing the clauses to all mean "the selected lending institutions simultaneously compete *by providing offers* for credit to the [ ] computer user via the computer network ('816 Patent) / internet ('594 Patent). A12, 11152 (emphasis added).

-28-

This Court has cautioned that "it is important not to import [limitations] into a claim [ ] that are not part of the claim." *Superguide Corp. v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 875 (Fed. Cir. 2004).  Here, the whereby clauses in claims 1 and 22 from the '816 Patent, and claim 1 from the '594 Patent do not contain the term "offers" anywhere within their language.  Only claim 7 from the '816 Patent uses "offers" within a "whereby" clause – "whereby the selected lending institutions compete with each other for business with the computer user by electing to make offers to the computer user."  A533.

Moreover, the district court's construction violates the canon of claim differentiation.  "It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985).

Here, the district court erroneously sought to read this limitation into claim 22 of the '816 Patent, even though dependent claim 24 contains the term "positive credit decisions" – which the district court construed to be identical in scope to "offers".  A534 ("The system of claim 22, wherein said processing unit is further operable for displaying a plurality positive credit decisions from the selected lending institutions to the computer user.").  This Court has held that "where the limitation that is sought to be 'read into' an independent claim already appears in a

-29-

dependent claim, the doctrine of claim differentiation is at its strongest." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004); *see also, Phillips*, 415 F.3d at 1314-15 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Thus, the district court erroneously imported into the whereby clause a limitation (*i.e.*, "offers") not found in the claim language. This error not only added limitations that were not present in the claims, but also imported an erroneous complex and legalistic construction of "offer" (i.e., "a proposal to extend credit that can be accepted by the user to create mutual assent – *i.e.,* contract and/or binding promise") to replace simple terms that were easily construed according to their ordinary meaning. The phrase, "whereby the selected lending institutions compete with each other for business with the computer [and/or Internet] user" consists of easily understood terms that require no specific construction. Indeed, even Zillow's fact witness, Erin Lantz, easily understood lenders competing without resorting to a complicated construction.

> **Q.** Now, lenders compete for customers business on Zillow Mortgage Marketplace, correct?

> **A.** Yeah. They compete by showing their rates and by showcasing their ratings and reviews so consumers can get a sense of which lender they want to work with.

**Q.** So as you indicated, one of the way[s] (sic) the lenders compete is
that they provide rate quotes, correct?

**A.** Correct.

A10608.

Moreover, the claimed competition does not require transmitting to the

potential borrower loan terms that constitute a contract or binding offer. *Compare*

A533, '816 Patent Claim 1 (no specific display or transmission to computer user

required) *with* '816 Patent Claim 12 (requiring a display of positive credit

decisions to the computer user via the computer network). Indeed, the preferred

embodiment transmits the claimed "offers" to borrowers before collecting

sufficient information to conclude a legal contract or binding offer. (Detailed

discussion in Section I.C. *supra*, A533 ('816 Patent 7:1-10).)

Thus, the district court's importation of "offers" into the "whereby" clauses

is contrary to the claim language and the specification. This Court should vacate

the district court's construction of the "whereby" clauses and construe those

clauses according to their ordinary meaning or, at a minimum, remove the

improper limitation that lending institutions must compete "by electing to make

offers to the computer user."

**G.     The District Court's Erroneous Construction of "Offer" and "Positive Credit Decision" and its Importation of "Offer" into the "Whereby" Clause Was Highly Prejudicial to LendingTree**

The district court's constructions of "offer" and "positive credit decision" and importation of "offer" into the "whereby" clause were all highly prejudicial to LendingTree. These errors infected every asserted claim and resulted in the introduction of improper testimony throughout the trial. Zillow used the district court's erroneous construction to improperly argue that LendingTree's claims required a *per se* contract or loan agreement. *See, e.g.*, A10391, 10394, 10396, 11244.

However, the patents and their preferred embodiments are focused on generating leads that **may** eventually lead to loan agreements. A532-33 (*e.g.*, Col. 5:12-17 ("If the criteria does not match with application 115, then in step 48, program 10 checks to see whether there is another lending institution in database 170. If there are no remaining lending institutions in database 170 then in step 59, computer 100 generates a message that no acceptable match has been found.")). Indeed, not every claim even requires a "positive credit decision." A533-34 (claims 1 and 22). Nevertheless, Zillow argued that there could be no infringement under the district court's construction of "offer" if, after the transmission of an "offer", any additional information were exchanged to close a loan. *See, e.g.*, A10391 (implying that "offer" must be an offer for a loan that can be accepted to

close the loan); A10394 (referring to actually approving a loan); 10396 ("[T]hose offers are not binding and cannot create a contract that will bind the lender?"); A11244 ("[A]ccording to Judge Whitney, that offer has to be an offer that can be accepted to create a binding promise or a loan, mutual assent.").

Zillow's accused lead-generation service does not collect a customer's name or social security number in the initial qualification form (A10600), but the service provides sufficient information to lenders from which the lenders then use to make quotes for potential loans to the potential borrower. *Id.* Zillow explicitly requires its lenders "to stand by their quotes" and admitted that borrowers could expect the offers received from its lead-generation service to be a binding commitment. A10601 ("[I]f nothing changes and all the information that they later provide doesn't change what they had originally said at the initial point of rate quote [ ] then the borrower would expect to end up with the same thing way down the road."). Accordingly, to avoid infringement, Zillow had to argue that an "offer" cannot occur until after the lending institution receives all the information needed to close a loan to avoid its services' rate quotes being seen as "offers" under the patents. The district court's erroneous construction allowed Zillow to make these improper arguments because its use of "contract", "binding promise" and "mutual assent," suggested a final document or agreement that is not required by the claims of LendingTree's patents.

The district court's modification of its construction from "contract" to "binding promise" during trial did not lessen LendingTree's prejudice. But it did exacerbate the confusion by replacing one erroneous construction with another erroneous construction. Indeed, by the time the district court modified its construction, many fact witnesses had already testified based on the district court's construction using the word "contract." These included not only LendingTree witnesses, but also Zillow's key non-infringement witnesses. For example, Zillow witness Erin Lantz, provided non-infringement testimony premised on the district court's "contract" construction.

> Q. Now, is there anything on this page that a user can click to enter a contract to get a loan?
>
> A. No.
>
> Q. Are these rates listed here binding?
>
> A. No.

A10593 (describing demonstrative of Zillow's webpage for the accused service – *see* A10592).

By the time the district court had purportedly corrected its erroneous construction from "can be accepted to by the user to create a contract" to an equally erroneous "can be accepted to by the user to create a binding promise," the damage on direct and cross-examination under an incorrect claim construction had already been done. *See* A10395, 10397 (implanting in the jury's mind that mutual

assent means a contract)[5].  In view of these facts, co-defendant NexTag's lead counsel openly acknowledged that no corrective instruction could cure the irreparable prejudice caused by the inaccurate phrase "i.e., a contract" in the juror notebook for good reason: the prejudice was irreversible. A10533 ("I'm not sure there is any instruction that would cure the problem.").

Zillow repeatedly argued that under the district court's improper constructions of "positive credit decisions" and "offers" its service could not infringe LendingTree's patents because the accused service did not initially collect sufficient information to close a loan and that any "offer" or "positive credit decision" on its service purportedly occurred before sufficient information had been collected to close a loan.  *See, e.g.*, A10593, 10759.  However, LendingTree's patents do not require the formation of a contract, or closing of a loan.  Indeed, some of LendingTree's asserted claims do not even require a "positive credit decision."  A533 ("Positive credit decision" appears in dependent claim 4, but not in independent claim 1.)  In LendingTree's patents, an "offer" refers only to loan terms for which a borrower may qualify and a positive credit decision is a positive decision regarding these terms.

---

[5] "**Q**. … Now to be within the bounds of LendingTree's patent, the offers that are provided users have to be a proposal to extend credit that can be accepted by the user to create mutual assent, i.e. contract, correct, Mr. Lebda? **A.** That is the claim construction here."

Importing "offer" into the "whereby" clauses was also prejudicial to LendingTree. Not only because the district court's constructions of "offer" was erroneous. But also because the district court imported the term into a phrase where it did not exist, and into claims where the term does not appear at all. For example, Claim 22 of the '816 Patent does not use the term "offer" at all, and only requires "competition" without reference to "offers." A534.

There was ample evidence that Zillow's accused service infringes LendingTree's patents under the correct constructions. *See, e.g.*, A10600-601. Accordingly, this Court should vacate the district court's claim constructions of "offer" and "positive credit decision", and the importation of "offers" into the "whereby" clause, and should remanded the case for a new trial under the proper claim constructions.

## II.    THE DISTRICT COURT COMMITTED EVIDENTIARY ERRORS THAT SERIOUSLY PREJUDICED LENDINGTREE

### A.    Standard of Review

This Court reviews evidentiary rulings under the criteria of the regional circuit, unless the evidentiary issue is unique to patent law or patent litigation and thus would benefit from national uniformity. *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 548 (Fed. Cir. 1998); *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1235, 1331 (Fed. Cir. 2010). "The Fourth Circuit reviews a district court's evidentiary rulings for an abuse of discretion." *Activevideo Networks, Inc. v.*

*Verizon Communications, Inc.*, 694 F.3d 1312, 1332 (Fed. Cir. 2012) (*citing United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996)).  An abuse of discretion occurs when a district court relies on an error of law or a clearly erroneous factual finding.  *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

### B.    LendingTree Was Improperly Denied Its Right to Examine Zillow's Key Expert Using the Patent Specification

The district court abused its discretion by prohibiting LendingTree from cross-examining Zillow's expert, Marshall Dennis, using the specification of the patents.  At trial, Zillow and its co-defendants repeatedly introduced testimony from Dennis that limited the application of the district court's construction of the term "credit data" so severely that even the preferred embodiment was excluded from coverage.  This included:

- Testimony that the "credit data" must include information sufficient to generate a credit report and "you have to have the borrower's name, Social Security number, and date of birth." A10760;

- Testimony that the "credit data" must also include a credit report and the address of the property for which a loan is being sought.  A10761;

- Testimony that "credit data" must include "the subject property address … borrowers name, their Social Security number, their date of birth and their present address." A10762;

- Testimony that an "offer" or "positive credit decision" can only occur after a lender receives a "completed [Form] 1003 which gives them … the information to order verifications of employment, the credit report, and to order the appraisal."  A10763

Dennis' testimony showed that he did not understand the nature of LendingTree's patents, and LendingTree attempted to walk Dennis through the preferred embodiment of the patents to show the jury that Dennis' noninfringement theory was inconsistent with the specification (even under the Court's construction)[6]:

> Q. The sentence [from the specification for the '816 Patent] says that, "The lending institution has the borrower's name and the Social Security number" … Now, you can understand that the borrower's name and Social Security number were not sent prior to acceptance, right?

A10768 (discussing A533 at 7:6-10).

Zillow objected, and at a side bar argued that LendingTree was "trying to reargue claim construction through our expert." A10768. LendingTree responded that Zillow's expert testified that a "Social Security number is required and that is inconsistent with the specification. LendingTree is entitled to [examine] that." A10769. However, the district court upheld Zillow's objection. *Id.*

As this Court has recognized, the patent specification is relevant beyond claim construction. It is relevant to the factual issues in the infringement analysis because a noninfringement theory that whittles down

---

[6] The argument that "credit data" specifically requires such detailed and specific information as a Social Security number, was even narrower than the district court's own understanding of its construction of "credit data." A10775, 11099

application of the claims so far as to exclude the preferred embodiment must be incorrect and unreliable. *See, e.g.*, *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1369–70 (Fed. Cir. 2012); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir.1986); *Linear Tech.*, 2006 U.S. Dist. LEXIS at *64–65; *Cimcore*, 2007 U.S. Dist. LEXIS, at *7. In *Tessera, Inc. v. ITC*, 646 F.3d 1357, 1365–1366 (Fed. Cir. 2011) this Court held that it is not "claim construction" to demonstrate inconsistencies in a party's infringement theory by showing how that theory excludes the preferred embodiment from practicing the invention. Here, LendingTree sought to conduct such an examination of Zillow's witness.

LendingTree also asked Dennis to read the description of the preferred embodiment found in Column six of the '816 Patent and asked him, "do you understand it?" His response was "[a]nything to do with computer technology is beyond me." A10770. However, Dennis was offering a non-infringement opinion on a patent directed toward computer technology. LendingTree should have been able to walk Dennis through the ten stages of the preferred embodiment to show that the borrower does not provide a Social Security number to the lender until "the acceptance email sent when the offer was accepted" in stage nine. A533. Using

the specification to illustrate that Zillow's expert did not understand the invention – which was described in computer flow charts and required a specific series of steps transferring computerized information – and was applying the claims in a way that excluded the preferred embodiment is not claim construction. *See Tessera, Inc. v. ITC*, 646 F.3d at 1365–1366.

LendingTree informed the district court that using the specification to examine Dennis' non-infringement opinion was "crucially important to the outcome of the case." A10769. Indeed, Dennis' testimony that "credit data" had to include at least a Social Security number, name and birthdate, and that "offer" had to lead to the closing of loan, was the foundation for Zillow's entire non-infringement defense and was repeatedly used by Zillow to support testimony by other Zillow witnesses and to cross-examine LendingTree witnesses. *See* A10788, 10947, 10987. Dennis, however, did not understand the patented technology on which he was offering an opinion, and LendingTree was entitled to show Dennis' lack of understanding to the jury by cross-examining him with the specification.

LendingTree had a right to confront Zillow's expert with the specification to reveal to the jury the fundamental flaws in the expert's testimony and Zillow's non-infringement positions. LendingTree promptly moved for a mistrial which was immediately denied. A10771. Thus, regardless of the district court's claim construction, LendingTree should be granted a new trial in which it will be

permitted to fully exercise its right to cross-examination using such obviously

relevant material as the patent specification.

### C.    The District Court Should Have Barred Appellees' Use of Irrelevant Testimony from Unrelated Litigations

Before this litigation, LendingTree's mortgage-lead-generation service was

accused of infringement by two patentees, IMX, Inc. and Search Source Techs,

LLC ("SST").  IMX asserted United States Patent No. 5,995,947 against

LendingTree.  *IMX, Inc. v. LendingTree, LLC*, 469 F.Supp.2d 203, 207 (2007).

This patent was directed to a method of processing loan applications by

maintaining the applications in a searchable database.  *Id.*  The *IMX* patent is not

related to LendingTree's asserted patents, and involved different claim terms with

different constructions than those in LendingTree's asserted claims.  *See id.* at 208.

During the *IMX* trial, LendingTree argued that its service did not infringe the

asserted claims from IMX's patents.  However, the jury disagreed and found that

LendingTree's service infringed IMX's asserted claims.  *Id.* at 207.  The *IMX* case

then settled pending appeal.

SST asserted United States Patent No. 5,758,328 against LendingTree.

*Source Search Technologies, LLC v. LendingTree LLC*, 588 F.3d 1063, 1066 (Fed.

Cir. 2009).  This patent is directed toward a method and system for processing

quotes for goods and services.  *Id.*  The *SST* patent is unrelated to LendingTree's

patents, and involved different claim terms with different constructions than those

in LendingTree's asserted claims. *Id.* at 1068.  Following claim construction and

discovery, the *SST* district court entered summary judgment finding the *SST* patent

infringed, but invalid.  *Id.* at 1066.  This Court reversed the district court on both

issues and remanded the case to the district court.  *Id.*  The *SST* case then settled

following remand.

The *IMX* and *SST* cases involved different patent claims, different

specifications, different accused products and different claim constructions.

A10748.  However, some of the terms and/or constructions of the *IMX* and *SST*

patents bore a superficial similarity to the terms in LendingTree's patents.  Indeed,

Zillow sought to have the term "credit data" from the LendingTree patents

construed in language very similar to the construction of "loan application" from

the *IMX* litigation.[7]  A1670.  Similarly, Zillow sought to conflate the district

court's construction of "offer" in this case, with the construction of "quote" in the

*SST* litigation.[8]  A10392-93.  Zillow then used these superficial similarities to

---

[7] The *IMX* Court construed "loan application" to mean "a request for an extension
of credit in a format that contains sufficiently detailed information to enable a
lender to grant or deny the request."  469 F.Supp 2d. at 208.  The *IMX* Court also
construed "bid" to mean "an offer to make a loan."  *Id.*  These constructions are
superficially similar to the district court's construction in this case of "credit
data" to mean "information entered on the qualification form sufficient for a
lending institution to extend or deny credit."

[8] In *SST*, the term "quote"  was construed to mean "price and other terms of a
particular transaction in sufficient detail to constitute an offer capable of
acceptance."  588 F.3d at 1071.  Zillow attempted to equate this with the district

argue that it could not infringe LendingTree's asserted patents, based on of

LendingTree's (unsuccessful) non-infringement arguments in *IMX* and *SST*.  *See*

A10392-393, A10395-397, 10610-613, 10945-947, 1097-48, 12087, 12108, 12127,

12362, 12450.

Zillow even altered a quotation from the *IMX* litigation by adding words—

"or deny"—to the *IMX* construction of "loan application" to make the statement

appear to address the district court's construction of "credit data" (*i.e.*,

"information entered on the qualification form sufficient for a lending institution to

extend or deny credit") in this case.  *See, e.g.,* A10946.  Similarly, Zillow equated

"loan applications," a construed term from the *IMX* patent litigation, to the

"qualification forms" referred to in the LendingTree patents.  A10392-93.  Thus,

Zillow used the constructions from the *IMX* litigation to argue that LendingTree's

asserted claims required complete loan applications (*i.e.*, a Form 1003) and must

result in an offer to formally close a mortgage.  Furthermore, through this line of

questioning, Zillow improperly used irrelevant claim constructions from the *SST*

and *IMX* litigations, and improperly sought to prove non-infringement based upon

statements regarding LendingTree's non-accused service.

---

court's construction in this case of "offer" and "positive credit decision" to mean
"a proposal to extend credit that can be accepted by the user to create mutual
assent [- i.e., contract and/or binding promise]."

When LendingTree witnesses did not agree that non-infringement testimony from the *IMX* and *SST* cases was applicable to the district court's construction in this case (of LendingTree's unrelated patents), Zillow accused LendingTree of lying.  For example:

> Q.  It's a simple yes or no question.  I'm asking you whether what LendingTree told the Court in IMX, that the LendingTree qualification form itself, does not solicit sufficient information for a lender to make a decision as to whether to extend credit, is a true statement or not.  A10394.

> Q.  Yes or no.  Is what LendingTree told the Court in IMX the truth or not?  A10394.

> Q.  This is your testimony under oath in front of the jury in IMX.  A10395.

> Q.  So you're saying that what you told the Court in IMX is false? …

> Q.  Wasn't the question.  Is what you -- the words on this page that LendingTree filed with the Court, true or false?

> A.  I believe what we told IMX in the IMX case was true.  A10398.

> Q.  …. So is the statement that LendingTree made in this paper that it filed with the United States Court of Appeals in the Federal Circuit, that LendingTree does not provide offers from lenders that borrowers can accept; is that a true statement?  A10398.

*See also,* A10610-13, A10947-48, A11243-45, A12108, A12196 (at 976:1–2), A12199-200 (at 987:25– 989:9), A12256 (at 1051:5–7), A12261 (at 1071:5–7).  As can be seen from these questions, Zillow repeatedly painted LendingTree as untruthful because it legitimately took different non-infringement positions in different litigations involving unrelated patents (which had different claim

language, different specifications, different claim constructions) and different accused products. Thus, despite significant substantive differences between the *IMX* and *SST* litigations and the litigation before the district court, Zillow and its co-defendants repeatedly asked LendingTree's witnesses to compare past testimony (often by different witnesses) regarding whether LendingTree's services infringed the *IMX* and *SST* patents to LendingTree's infringement allegations regarding Zillow's products. A10610-13, A10947-48, A12108, A12196 (at 976:1– 2), A12199-200 (at 987:25– 989:9), A12261 (at 1071:5–7).

This line of questioning was extremely prejudicial to LendingTree because it not only confused the jury regarding what claim terms were at issue, but also painted LendingTree in a negative light as a serial patent infringer and dishonest litigant. LendingTree recognized this danger early on and requested that the district court exclude testimony regarding IMX's and SST's patents and the LendingTree services accused of infringing those patents. *See* A10153 (questioning relevance of *IMX* and *SST* testimony); A10154 (warning against extrapolating from the positions taken regarding claim constructions involving different patents to positions taken regarding the district court's claim construction of the asserted patents).)

Before the jury, Lending repeatedly objected to questions involving claim constructions and testimony from the *IMX* and *SST* cases. *See, e.g.,* A10394,

10395, 10396 (asking for continuing objection), 10611, 10613. LendingTree requested a continuing objection when Zillow cross-examined LendingTree's CEO regarding whether "offers" in LendingTree's service "were capable of acceptance" using LendingTree's appeal brief from the *SST* litigation. A10396 at 890:4-13 (Zillow's counsel quoting from A12439). The district court overruled the objection. *See id.* After this ruling it would have been futile to continue objecting on this point and would only have made LendingTree appear overly combative. The district court's repeated overruling of LendingTree's objections gave the jury an erroneous impression that Zillow's line of questioning was proper and gave the repeated allegations of inconsistent testimony undue importance and weight.

When ruling on LendingTree's post-trial motions, the district court acknowledged that the claim constructions from the *IMX* and *SST* cases were irrelevant. A37. But the district court then stated that testimony from the *IMX* and *SST* cases "was relevant for the jury in the case at bar to hear how LendingTree witnesses had testified, under oath, concerning their patented systems and processes in order to evaluate the credibility of the testimony in this case." A37. But LendingTree's testimony in the *IMX* and *SST* cases was related to whether LendingTree's lead-generation service infringed patents held by IMX and SST. *See IMX,* 469 F.Supp.2d at 207; *SST*, 588 F.3d at 1066. The IMX and SST patents were unrelated to the patents LendingTree asserted against Zillow, and all prior

testimony regarding LendingTree's products took place in the context of the claim

constructions issued for different parties by different courts in those earlier

litigations. Thus, the testimony could not have been inconsistent with the relevant

issue before the jury – *i.e.*, whether LendingTree's patents cover Zillow's services.

Moreover, Zillow did not use the prior testimony to show discrepancies in how

LendingTree witnesses had described LendingTree systems (which were not

accused of infringement in this case) in the context of unrelated patents, but instead

to argue that Zillow did not infringe LendingTree's patents.

Testimony from the *IMX* and *SST* cases was irrelevant, confusing to the jury,

unduly prejudicial to LendingTree, and should not have been allowed in this case.

References to the *IMX* and *SST* litigations occupied more time than any other issue

in Zillow's and its co-defendants' cross examination of LendingTree's corporate

witness, inventor and expert witnesses. *See* A10392-398, 10610-613, 10945-948,

10952-53, 11243-45, 12087, 12108, 12127, 12362, 12450. Thus, Defendants'

false allegation of LendingTree's purportedly inconsistent statements began early

in the case, continued throughout the case, and was a theme at closing. A11243-

45. This intentionally placed undue weight on irrelevant testimony from the *IMX*

and *SST* cases, and confused the jury regarding the relevance of claim

constructions of unrelated patents in these different patent lawsuits.

The undue distraction caused by this irrelevant testimony significantly prejudiced LendingTree's right to put on its infringement case based on the district court's claim constructions alone. The jury was faced with claim construction arguments involving different patents and different services, from different cases. However, juries are not equipped to deal in claim construction, nor to compare constructions of unrelated patents from different cases. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996).

Thus, regardless of this Court's ruling on the district court's claim construction, this Court should vacate the finding of non-infringement and remand this case for a new trial on the issues of damages and infringement where Zillow will not be permitted to use non-infringement testimony from the *IMX* and *SST* cases to falsely suggest that LendingTree's witnesses are being untruthful in this litigation.

## III.   THE DISTRICT COURT IMPROPERLY REFUSED TO VACATE THE JURY'S FINDING OF INVALIDITY DUE TO IMPROPER INVENTORSHIP

The predecessor to LendingTree was founded by Doug Lebda and James Bennett in 1996. A10272. Richard Stiegler became involved with LendingTree in the Spring of 1997 and signed an employment agreement in July 1997. A10277. At that time, some aspects of the invention of the '594 and '816 Patents had been conceived, but had not been reduced to practice and were not ready for patenting

until Stiegler contributed the claimed back-end and filtering technology that was necessary to make the patented inventions work.  A10277, 10341, 11049.  The application that resulted in the '594 Patent was filed on May 8, 1998.  A500.  It listed Lebda and Stiegler as inventors.  *Id.*  Bennett signed an employment agreement with LendingTree in 1998 and was at LendingTree while the '594 Patent was being prosecuted.  But he never suggested to anyone at LendingTree that he should be named as an inventor on the patent, nor himself believed that he should be a named inventor until years after he had left LendingTree.  A12507 (Bennett Depo. at 211:9-24).

As part of its defense in this case, Zillow argued that the '594 and '816 Patents were invalid for lack of proper inventorship.  Zillow and its co-defendants presented evidence that Bennett may have contributed to some asserted claims, but never presented any evidence regarding Bennett's (or any named inventor's) contribution to the forty-nine non-asserted claims.  There was also undisputed testimony regarding Lebda's and Stiegler's contribution to both asserted and non-asserted claims.  A10277, 10341.  After considering the testimony regarding the asserted claims, the jury issued a verdict that the '594 and '816 Patents were invalid for improper inventorship.  A7228.  LendingTree moved the Court to correct inventorship under 35 U.S.C. §256, which states that the "error of omitting inventors or naming persons who are not inventors ***shall*** not invalidate the patent

-49-

in which such error occurred if it can be corrected[.]"  The Court denied that request stating that it could not determine the basis for the jury's verdict of invalidity (A31-33) but also instructed LendingTree to seek correction from the Patent Office.  A33 ("[T]he inventorship dispute may be resolved by the PTO.")

## A.    Standard of Review

The district court refused LendingTree's request to hold a hearing to correct inventorship on the ground that Title 35, Section 256 is permissive and not mandatory, and on the ground that the district court is required to defer to the jury's findings (or lack thereof) as to the correct inventors.  These are pure questions of law reviewed *de novo*.  *See Fina Tech., Inc. v. Ewen*, 265 F.3d 1325, 1327 (Fed. Cir. 2001) (reviewing *de novo* the issue of whether Section 256 empowered district courts to change the order of inventors on the patent, as it "presents an issue of statutory interpretation, a matter of law that we review de novo"); *Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1552 (Fed. Cir. 1997) (applying *de novo* review to the "sole issue in this case . . . the meaning of Section 256," *i.e.*, whether the substantive standards for correcting inventorship under Section 256 applied in both administrative and judicial proceedings and whether correction for misjoinder under Section 256 required inquiry into intent).

### B.    The District Court Committed Reversible Error in Refusing to Correct Inventorship Pursuant to 35 U.S.C. Section 256

### 1.    Upon invocation of Section 256, it is required—not discretionary—for a district court to make its own determination of inventorship and issue an order correcting inventorship.

35 U.S.C. Section 256 (pre-America Invents Act)[9] states:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error. The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

After the jury verdict, LendingTree requested, pursuant to Section 256, that the district court hold a hearing on inventorship, but the district court refused. The district court concluded that Section 256 did not "require" such a determination, but that it was merely permissive. A32-33. This finding was reversible error.

The express language of Section 256 requires that the "error of omitting inventors or naming persons who are not inventors *shall* not invalidate the patent

---

[9] In the AIA, Congress removed the words "and such error arose without deceptive intent" from Section 256. This case arose before the AIA section on inventorship took effect, but LendingTree requested relief under Section 256 after the AIA took effect. Thus, it is unclear precisely which version of Section 256 applies to this case. However, LendingTree's patents should be corrected regardless of the version of Section 256 applied.

in which such error occurred[.]" (Emphasis added.) The statute further requires a district court to "order correction of the patent on notice and hearing of all parties concerned." *Id.* This Court has been unequivocal that once a patentee "claim[s] entitlement to relief under the statute the court *must* give the patentee an opportunity to correct inventorship," as Section 256 is a "savings provision." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998) ("Upon . . . a finding of incorrect inventorship, a patentee may invoke section 256 to save the patent from invalidity. Accordingly, the patentee *must* then be given an opportunity to correct inventorship pursuant to that section.") (emphasis added). There is nothing discretionary about *Pannu*'s holding. Nonetheless, the district court stated it was "unconvinced" that *Pannu* "mandates that this Court resolve inventorship disputes." A32. The district court, however, did not explain what about the *Pannu* decision left it "unconvinced." A32-33.

Instead, the district court relied on several inapposite decisions to reach its decision. *Id.* In *Fina Technology, Inc. v. Ewen*, 265 F.3d 1325 (Fed. Cir. 2001), cited by the district court (A32), this Court addressed the statutory interpretation question of whether Section 256 empowers courts to change the *order* of inventors on the patent. 265 F.3d at 1328. In *Bd. of Educ. ex rel. Bd. of Trustees of Florida State Univ. v. Am. Bioscience, Inc.*, 333 F.3d 1330 (Fed. Cir. 2003), also relied on by the district court (A32), the Court reviewed the findings of a Section 256 claim

after a bench trial, and concluded the district court had ***erred*** in finding incorrect

inventorship.  333 F.3d at 1337, 1344.  These cases did not address the legal issue

before this Court: whether the district court is required to give a patentee an

opportunity to correct inventorship once the patentee has claimed relief under

Section 256.

Similarly, the other decisions relied on by the district court do not bear on

whether a determination of inventorship under Section 256 is mandatory or

discretionary.  *See* A32-33; *MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568,

1570 (Fed. Cir. 1989) (finding a district court has ***jurisdiction*** to determine

inventorship and correct a patent under section 256); *Stevens v. Broad Reach*

*Companies, L.L.C.*, No. 05-647-CV-W-GAF, 2006 WL 1556313, at *2, *6 (W.D.

Mo. May 31, 2006) (finding 35 U.S.C. section 116 does not empower a court to

resolve inventorship disputes in patent ***applications***, and distinguishing Section

116 from Section 256 – which expressly empowers courts to resolve inventorship

disputes for issued patents); *Mas-Hamilton Grp. v. LaGard*, Inc., 21 F. Supp. 2d

700, 711-12 (E.D. Ky. 1997) (finding after a bench trial that patent was ***not invalid***

due to incorrect inventorship because the errors were not the result of deceptive

intent).

Meanwhile, LendingTree has found no case after *Pannu* in which a district

court has refused—or been allowed by this Court to refuse—to correct

inventorship following a party's invocation of Section 256 when there has been no finding of deceptive intent on the part of the unnamed inventor. *See, e.g., Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1375 (Fed. Cir. 1999) (vacating district court's order refusing to correct inventorship where the only deception found was on the part of the *named* inventor, and ordering that "[u]pon remand, the district court will have the opportunity to reconsider [plaintiff's] section 256 claim"); *Yeda Research and Dev. Co. v. Imclone Sys. Inc.*, 443 F. Supp. 2d 570, 630 (S.D.N.Y. 2006) (ordering the PTO to issue certificate correcting patent after bench trial on plaintiff's Section 256 claim). Indeed, this Court has reversed invalidity determinations after trial when inventorship can be corrected under Section 256. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1353 (Fed. Cir. 1998) (finding that where evidence of deceptive intent was "absent," and thus inventorship must be corrected under Section 256, "the judgment of invalidity based on incorrect inventorship [cannot] stand, and is reversed"). Here, the district court refused to even ***consider*** whether to correct inventorship. *See* A33 ("the Court in its discretion[] declines to make a determination as to inventorship").

The district court's erroneous refusal to make a Section 256 determination flouts the very purpose of the statute: "to mitigate the hardship of mistake" in naming inventors, because "[w]hether a patent is the work of one or several

inventors acting jointly is often a question that is not free from difficulty." *Iowa State Univ. Research Found., Inc. v. Sperry Rand Corp.*, 444 F.2d 406, 408 (4th Cir. 1971) superseded on other grounds as stated in *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 601 (Fed. Cir. 1985). Indeed, the legislative history of the statute highlights the mandatory nature of Section 256:

> Very often two or three people make an invention together. They must apply as joint inventors. If they make a mistake in determining who are the true inventors, they do so at their peril. This provision permits a bona fide mistake in joining a person as an inventor or in failing to join a person as an inventor to be corrected.

*Id.* (quoting S. Rep. No. 1979, 82d Cong., 2d Sess., p. 7 (1952)). Once a patentee seeks correction under Section 256, the district court must hold a hearing to determine whether correction is possible – *i.e.*, whether the unnamed inventor's name was left off the patent because of deceptive intent on the part of the unnamed inventor. *C.R. Bard*, 157 F.3d at 1353. The district court's refusal to conduct such a hearing was erroneous. This Court should reverse the district court's judgment of invalidity and order correction of inventorship under Section 256.

**2. That the jury did not identify the correct inventors in a special verdict does not relieve the district court of the requirement to determine inventorship under Section 256.**

The district court erred in finding that LendingTree is precluded from invoking Section 256 because it did not seek a special verdict from the jury specifically identifying the correct inventors. A33. Whether the district court is

required to correct inventorship under Section 256 is ***not contingent*** on the jury identifying *who* the correct inventors are.  *See* 35 U.S.C. §256.  Nowhere does the statute require the district court to defer to a jury's identification of the correct inventors—nor does the case law impose such a requirement.  *See generally Marketel Int'l, Inc. v. Priceline.com*, 138 F. Supp. 2d 1210, 1213 (N.D. Cal. 2001) ("Correction of inventorship under section 256 is resolved by bench trial and is ***not submitted to a jury***.") (emphasis added); *see generally Ethicon, Inc. v. U.S. Surgical Corp.*, 921 F. Supp. 901, 902, 905 (D. Conn. 1995) (denying motion to have jury decide whether to correct inventorship); *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1338 (Fed. Cir. 2005) ("Inventorship is a question of *law* with underlying factual issues.") (emphasis added).  Instead, the statute plainly states that the "error of omitting inventors or naming persons who are not inventors shall ***not*** invalidate the patent in which such error occurred if it can be corrected"—without any caveats as to a jury's findings.  35 U.S.C. §256 (emphasis added).  Moreover, Section 265 does not punish a party for not requesting that a jury identify the correct inventors through a special verdict.  *See* 35 U.S.C. §256; *Pannu*, 155 F.3d at 1350.  Thus, neither this Court, nor the district court, requires a special verdict form to correct inventorship.  *Id.*

**3.  Even if the district court were required to defer to the jury's identification of correct inventors, substantial evidence could only support incorrect inventorship due to the omission of Bennett.**

Even if Section 256 required the district court to defer to a jury's findings rather than make its own determination based on the evidence at trial—it does not—the district court still erred in finding the patent incapable of correction on the ground that the jury did not identify the correct inventors.  Patents are presumed valid; therefore, invalidating a patent requires *clear and convincing evidence*. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998); *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004); *see also* Jury Verdict Form, A7228.  Here, only one ground for incorrect inventorship could have supported the jury's finding under the clear and convincing evidence standard to which it was subject—or the substantial evidence standard under which the district court reviews the jury's finding—that *James Bennett* was incorrectly omitted.

In deciding a JMOL, the district court must determine whether *substantial evidence* supported the jury's finding.  *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed. Cir. 1984).  Inventorship only requires that a co-inventor make a contribution to a single claim.  *See Eli Lilly*, 376 F.3d at 1361-62 (emphasis added); *see also Ethicon*, 135 F.3d at 1460; Jury Instructions, A11158.  Zillow and its co-defendants did not present any evidence regarding the non-

-57-

asserted claims.  That is, if Zillow wanted to prove that Lebda and/or Stiegler was

an improperly named inventor, then Zillow needed to address each and every claim

of the asserted patents and prove that Lebda or Stiegler did not contribute to a

single claim in the patents.  Because Zillow did not put in any evidence to show

that either Lebda or Stiegler failed to contribute a single element to a single claim,

the jury verdict could only support a finding that Bennett was an unnamed

inventor.

Furthermore, LendingTree presented substantial unrebutted evidence at trial

to show that Stiegler and Lebda are properly named inventors.   When asked what

Stiegler contributed to the invention, Lebda testified, "I mean, we could tick

through every -- everything and go through every claim . . . if you read these

patents and if you look at the flow charts that are in there and the descriptions of

the systems and the technology and where -- and how the technology is going to

work, I didn't know any of that."  A10277.  Stiegler contributed the filtering

technology.  *Id.*  Similarly, when Tara Lebda, a fact witness, was asked at trial

what Stiegler contributed to the patents, she replied:  "The whole system.  The

whole back-end system.  The whole filtering technology."  A10341.  The

requirement for filtering technology is explicitly found in asserted and non-

asserted claims of the '594 and '816 Patents.  *See* A514 ('594 Patent Claims 6, 7 –

asserted), A533 ('816 Patent Claims 4, 5 – non-asserted).  Stiegler also contributed

the security solutions and protocols claimed in LendingTree's patents.  A10278.

The requirement for security protocols and technology is found in non-asserted

claims 9, 10, 30, 35 and 36 from the '594 Patent, and claims 10 and 11 from the

'816 Patent.  A515-17, 533.

Zillow may argue, as it did below, that Stiegler could not be a properly

named inventor because purportedly "all aspects of the inventions in the patents-in-

suit were conceived" by March 1997, before Stiegler joined the company.  *See,*

*e.g.,* A9046.  But Zillow's argument ignores the unrebutted testimony cited above.

All the relevant testimony was explicitly limited to the asserted claims of the

patents-in-suit.  For example, Bennett's deposition testimony only states that he

believed he contributed to claim 1 from the '594 Patent, and claims 1 and 2 from

the '816 Patent.  A12507.  LendingTree's expert Joseph McAlexander testified as

to the conception date of the inventions claimed in the ***asserted*** claims of the

patents-in-suit.  A7303 (stating that the "LendingTree ***asserted*** claims,

corresponding to the Patents-in-suit [are] subject to this Expert Report"))

(emphasis added); *see also* A7288-89.  Similarly, Zillow's expert Glenn Weadock

also expressly limited his opinion to the asserted claims of the patents-in-suit.

A7280 (Weadock Opening Expert Rpt., (¶1) ("I have been asked by defendants

Zillow and Adchemy to provide my expert analysis and opinions . . . specifically

with regard to asserted claims 1-3 and 6-14 [of the '816 Patent and] specifically

with regard to claims 1-9, 11, and 18-24 [of the '594 Patent] (collectively the 'patents-in-suit,' and the 'asserted claims').").  Thus, there is *no* testimony by Mr. Alexander, Weadock—or anyone else—purporting to encompass every element of every claim of the patents-in-suit.

In sum, because there was no testimony regarding each limitation of each claim and only limited unrebutted testimony regarding Stiegler's contribution to the patents, there was neither substantial—nor clear and convincing—evidence for the jury to find that Stiegler was incorrectly named as an inventor on the patents. Accordingly, the jury's finding of incorrect inventorship could *only* have been based on the purported omission of Bennett.

### 4.    The district court erred by failing to order the PTO to correct inventorship in this case.

The district court further erred in finding that "[i]f the Court does not exercise jurisdiction over the inventorship dispute, the inventorship dispute may be resolved by the PTO."  (A33.)  Although LendingTree has requested correction from the PTO (A12509-12630), it is not clear that the PTO will take any action on that request until prior to this appeal being decided.  Thus, the only option remaining for LendingTree under Section 256 is to obtain an "order of a court before which such matter is called in question."  37 C.F.R. 1.324(a).  This Court

should order the PTO to correct inventorship by adding Bennett as an inventor to the patents-in-suit.

Although the district court indicated that LendingTree should request correction of inventorship before the PTO, it failed to issue an order specifically directing the PTO to correct inventorship. *Pannu* holds that a patentee must be given an opportunity to correct a finding of invalidity for improper inventorship. *See Pannu*, 155 F.3d at 1350. Because the district court found that the PTO may correct inventorship, this Court should vacate the judgment of invalidity and issue an order directing the PTO to correct inventorship.[10]

## CONCLUSION

The district court committed four key errors. These include:

- Erroneously construing of the claim terms "credit data," "offer," "positive credit decisions," and the "whereby" clauses.

- Erroneously permitting Zillow and its co-defendants to introduce argument and testimony regarding non-asserted patents from unrelated patent litigations.

- Erroneously prohibiting LendingTree from cross-examining Zillow's expert with the patent specification.

---

[10] Alternatively, this Court should remand with instructions for the district court to hold a hearing under Section 256 to correct inventorship.

- Erroneously refusing to correct LendingTree's patents under 35 U.S.C. §256.

LendingTree respectfully requests that this Court reverse the district court on these issues and remand for findings consistent with the reversal.

DATED:  September 14, 2015

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____/s/ Stephen S. Korniczky_____
Stephen S. Korniczky

Attorneys for
Plaintiff – Appellant LendingTree, LLC

# CERTIFICATE OF SERVICE

*LendingTree, LLC v. Zillow, Inc., et al.*,
Case Nos. 14-1435, 14-1531, 14-1532, 2015-1186

In accordance with Fed. R. App. P. 25 and Fed. Cir. R. 26, this is to certify

that on September 14, 2015, the foregoing **APPELLANT LENDINGTREE,**

**LLC'S OPENING BRIEF** was filed with the Clerk of the Court using the

CM/ECF System, which will serve via email a copy of the foregoing document on

all the following counsel of record registered as CM/ECF users:

Lynn Pasahow, lpasahow@fenwick.com
J. David Hadden, dhadden@fenwick.com
Carolyn Chang, cchang@fenwick.com
Saina S. Shamilov, sshamilov@fenwick.com
Todd Richard Gregorian, tgregorian@fenwick.com
Ravi Ragavendra Ranganath, rranganath@fenwick.com
Yevgeniya A. Titova, etitova@fenwick.com

I further certify that, upon acceptance and request from the Court, the

required paper copies of the foregoing will be deposited with Federal Express for

delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE

FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service was performed in accordance with the

instructions given to me by counsel in this case.


Dated:  September 14, 2015                    /s/ *Amy Mertens*
                                              Amy Mertens

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a) TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,949 words, excluding parts of the brief exempted by Federal Rules of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003, using 14 point Times New Roman font.

DATED:  September 14, 2015

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____ */s/ Stephen S. Korniczky* _____
Stephen S. Korniczky

Attorneys for
Plaintiff–Appellant LendingTree, LLC